Judge Rosemary Ledet
|! This is a consolidated concursus and damages action. This action arises out of an alleged breach of an agreement to purchase immovable property and resulting forfeiture of the deposit. Following a bench trial, the trial court rendered judgment in favor of the defendant-purchaser, Frank Scurlock, and against the plaintiff-seller, Teresa (“Terri”) Ditta, M.D., and her real estate agent, Latter & Blum, Inc. The trial court also awarded Mr. Scurlock the return of his $100,000 deposit, which the real estate agent had deposited into the registry of the court. For the reasons that follow, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
On May 28, 2013, Dr. Ditta, as seller, and Mr. Scurlock, as buyer, entered into a Louisiana Residential Agreement to Buy or Sell (the “Agreement”). The Agreement was for the purchase of a mansion located at 3711 St. Charles Avenue in New Orleans, Louisiana—an approximately 18,000 square feet lot (the “Property”). In the Agreement, the Property is described as “including all buildings, structures, components parts, and ... all fences.” The purchase price |2was $3,400,000. The parties agreed to divide the purchase price into the following two parts: (i) the immovable property—specifically including the fences—to be sold for $1,800,000; and (ii) certain furnishings—miscellaneous household goods—and a limousine to be sold for $1,600,000. The Agreement was an “all cash” sale. In addition to the purchase price, the Agreement required Mr. Scur-lock to make a deposit of $100,000 to be held in escrow by Latter & Blum.
In exchange for Mr. Scurlock’s payment of the deposit and the purchase price, the Agreement obligated Dr. Ditta to deliver a merchantable title at closing; the Agreement provided as follows:
The SELLER shah deliver to BUYER a merchantable title at SELLER’S costs. ... SELLER’S inability to deliver merchantable title within the time stipulated herein shall render this Agreement null and void, reserving unto BUYER the right to demand the return of the Deposit and to recover from SELLER actual costs incurred in processing of sale as well legal fees incurred by BUYER.
On July 25, 2013, the day before the scheduled closing, Mr. Scurlock’s previous attorney and the closing attorney—Ewell “Corky” Potts, III—sent an email to Dr. Ditta’s attorney—James Mounger. In this email, Mr. Potts acknowledged that judgment and mortgage issues had been addressed properly; however, he raised issues regarding fence encroachments and misalignments. Mr. Potts stated that the *57 new survey, dated July 17, 2013, revealed fence encroachments or misalignments by the Property onto adjoining properties. Mr. Potts also stated that he had reviewed “the lawsuit” and had not found “a resolution to the boundary dispute with the adjoining owner which was purported to be 4 S ^Investments, LLC” (the “2005 Lawsuit”).[1] For these reasons, Mr. Potts, on Mr. Scurlock’s behalf, invoked the thirty-day automatic extension provided for in the Agreement. The closing was rescheduled for August 26, 2013.
Attempting to cure the alleged fence encroachment and misalignment issues, Dr. Ditta, assisted by her two attorneys, Mr. Mounger and Lawrence Genin, executed boundary agreements with the owners of each of the following three adjoining properties: 1628 Amelia Street, 1615-17 Peniston Street, and 3721 St. Charles Avenue. Dr. Ditta spent approximately $6,000 to secure the three boundary agreements.[2] By the three boundary agreements, the parties agreed to the boundary lines reflected by the existing fence surrounding the Property. As the trial court noted, “Dr. Ditta testified that it was her intent to resolve the alleged-encroachments before the August 26th closing date.”
On August 18, 2014—eight days before the closing date—Mr. Scurlock sent an email to multiple recipients, including Dr. Ditta and Mr. Potts (the “Email”). In the Email, Mr. Scurlock alluded to his contentious divorce proceeding; he stated pthat his soon-to-be former wife, Patricia Scur-lock (“Patty”), and her legal team were “trying to control” him. Expressing his desire to cancel the purchase of the Property, Mr. Scurlock stated:
Corky [Potts], I am not going to show up for the St. Charles closing on August 26th as well so [P]atty will share equally in the default provisions of that as well. This was to be my birthday present that [RJegions was financing[,] but I will forgo that as well without settlement and documents in place. Amy with [Rjegions was close to funding that.
On August 22, 2013, Dr. Ditta’s attorneys recorded the three boundary agreements in the Orleans Parish conveyance records. • On that same date, one of Dr. Ditta’s attorneys, Mr. Genin, sent a letter to Mr. Potts seeking information on whether Mr. Scurlock was going to purchase the Property. The letter stated that if Mr. Scurlock was going to default, as he stated in the Email, Dr. Ditta would pursue the $100,000 deposit, which was in escrow. Mr. Genin further stated that his “client is ready, willing, and able to conclude this matter at any time and place so *58 designated” and that “all requirements to deliver merchantable title to the buyer have been met.”
On August' 26, 2013, Mr. Scurlock, as he stated in the Email, failed to appear at the closing; however, his attorney, Mr. Potts, attended. In lieu of dosing, Mr. Potts performed a proems verbal in which he explained that significant title deficiencies regarding the fence encroachments • still remained, rendering the property unmer-chantable. Mr; Potts also advised that Mr. Scurlock was not accepting title to the Property because the title was unmer-chantable.
1 ^Shortly thereafter, Latter & Blum notified Mr. Scurlock that he was in default. On September 11, 2013, Mr. Scurlock made a second offer to purchase the Property for $1,800,000; this offer was rejected. On September 18, 2013, Dr. Ditta sold the property to a third party, Bob G. Dean, Jr., for $2,100,000. The movables were auctioned.
This litigation began when both Mr. Scurlock and Dr. Ditta requested that Latter & Blum release the $100,000 deposit to them. On September 17, 2013, Latter & Blum filed the instant concursus action pursuant to La. R.S. 37:1435(H) to resolve the dispute over the deposit; it deposited the $100,000 into the registry of the court. In the concursus action, Latter & Blum named as defendants Dr. Ditta and Mr. Scurlock. Both Dr. Ditta and Mr. Scurlock answered the concursus action and named a defendant-in-reconvention. Dr. Ditta named Mr. Scurlock; Mr. Scurlock named his former wife, Ms. Scurlock.
On September 18, 2013, Dr. Ditta and Latter & Blum jointly filed a damages action against Mr. Scurlock (the “Damages Action”). In the Damages Action, Dr. Ditta requested damages for breach of the Agreement; Latter & Blum requested the commission that it would have earned had the sale occurred. On November 24, 2015, the trial court granted the parties’ joint motion-to transfer the later-filed Damages Action to the same division as the earlier-filed concursus action and to consolidate the two actions for trial.
On October 31, 2014, Dr. Ditta filed a motion for partial summary judgment in the concursus action, which had not yet been consolidated with the. Damages | (¡Action. She contended that there was no genuine issue of materialiact in dispute as to whether Mr. Scurlock breached the Agreement. According to Dr. Ditta, Mr, Scurlock, by the Email, anticipatorily breached the Agreement; defaulted under the Agreement; and thus was liable to her. She also contended that the Property was merchantable and that any alleged defect was cured when she executed the boundary agreements, for consideration, with the adjoining property owners.
The trial court denied Dr. Ditta’s motion for partial summary judgment. This court denied Dr. Ditta’s writ application. Latter & Blum, Inc. v. Ditta, 15-160 (La. App. 4 Cir. 3/25/15) (unpub.). In so doing, this court stated that “[considering that genuine issues of fact exist in relation to the merchantability of 3711 St. Charles Avenue, the trial court properly denied relator’s motion for partial summary judgment on January 13, 2015.”' Id.
In July 2016, a three-day bench trial was held. Following the trial, the trial court took the matter under advisement. On October 10, 2016, the trial court rendered judgment in Mr. Scurlock’s favor, finding:
• [Mr.] Scurlock has established by' a preponderance of the evidence that the title to Dr. Ditta’s property was not merchantable on the scheduled closing date. Therefore, he was not required to buy the [Property and is *59 entitled to the $100,000 deposit presently held in the Court’s registry.
• [Mr.] Scurlock’s 18 August 2013 email did not anticipatorily breach the purchase agreement. Accordingly, [Dr.] Ditta’s claims for damages, along with Latter & Blum’s $156,367.62 claim for sales commissions, are dismissed. .
This appeal by Dr. Ditta and Latter & Blum (the “Appellants”) followed.
J^STANDARD OF REVIEW
 . Factual findings are reviewed under “the manifest error-clearly wrong standard, which precludes the setting aside of a district court’s finding-of fact unless that finding is clearly wrong in light of the record reviewed in its entirety.” Hall v. Folger Coffee Co., 03-1734, p. 9 (La. 4/14/04), 874 So.2d 90, 98 (citing Cenac v. Public Access Water Rights Ass’n, 02-2660, p. 9 (La. 6/27/03), 851 So.2d 1006, 1023). Under the manifest error standard; “the issue to be resolved by a reviewing court is not whether the trier of fact was right .or- wrong, but whether the faetfin-deris conclusion was a. reasonable one.” Stobart v. State through Dep’t of Transp. & Dev., 617 So.2d 880, 882 (La. 1993). The manifest error standard of review also applies to mixed question of law and fact. Brasseaux v. Town of Mamou, 99-1584, pp. 7-8 (La. 1/19/00), 752 So.2d 815, 820-21. Questions of law are reviewed using the.de novo standard. 2400 Canal, LLC v. Bd. of Sup’rs of Louisiana State Univ. Agr. & Mech. College, 12-0220-22, p. 5 (La. App. 4 Cir. 11/7/12), 105 So.3d 819, 824.
DISCUSSION
Although Dr. Ditta and Latter & Blum assert about a dozen assignments of érror,[3] we find that this appeal presents only two issues: (i) anticipatory breach of contract; and (ii) merchantability of title. We separately address each issue.
' IsAnticipatory Breach
Louisiana courts have recognized the doctrine of anticipatory breach of contract.[4] The. doctrine of anticipatory breach *60 of contract “ ‘applies when an obligor announces he will not perform an obligation which is due sometime in the future.’” Fertel v. Brooks, 02-0846, p. 13 (La. App. 4 Cir. 9/25/02), 832 So.2d 297, 305 (quoting Gulf Coast Bank & Trust Co. v. Rick Granger Enterprises, 2001-0656, p. 3 (La. App. 3 Cir. 10/31/01), 800 So.2d 402, 404 (quoting B & G Crane Service, Inc. v. Aetna Cas. and Sur. Co., 586 So.2d 710, 712 (La. App. 3rd Cir. 1991)). Under those circumstances, “[t]he obligee need not wait until the obligor fails to perform for the contract to be considered in breach.” Id. The jurisprudence, however, also has recognized the principle of retraction of an anticipatory breach (repudiation) of contract. See Marek v. McHardy, 234 La. 841, 855-56, 101 So.2d 689, 694 (1958).
| ¡/‘Following an anticipatory repudiation of a contract, the repudiator may, by acting quickly enough, retract the repudiation and reinstate the contract as to future performance.” 15 Richard A. Lord, WIL-LISTON ON CONTRACTS § 43:19 (4th ed. 2014).[5] Acknowledging this principle of retraction, the Louisiana Supreme Court has stated that “[i]t is generally recognized ... that the repudiator may retract his repudiation unless the promisee, in relying on the repudiation, has changed his position to such an extent that subsequent performance is impractical, in which case the injured party may, nevertheless, recover damages.” Marek, 234 La. at 855-56, 101 So.2d at 694.
Both in her motion for partial summary judgment and at trial, Dr. Ditta argued that the Email established Mr. Scurlock’s anticipatory breach. At trial, the other appellant, Latter & Blum, joined in this argument. Mr. Scurlock neither disputed the authenticity of the Email, nor denied sending it. Rather, he argued that the meaning of his statements in the Email were susceptible to interpretation; that in the Email, he did not unequivocally refuse to execute the act of sale; and that there was no evidence that he would not have closed if Dr. Ditta had cured the title defects. He further argued that his performance was not due until Dr. Ditta provided merchantable title at the closing. Stated otherwise, he argued that the doctrine of anticipatory breach did not apply because Dr. Ditta’s delivery of merchantable title was a sus-pensive condition.
hfAgreeing with Mr. Scurlock, the trial court stated in its reasons for judgment the following:
[Mi*.] Scurlock’s obligation to buy was not due until Dr. Ditta could deliver merchantable title. The purchase agreement states that the “Seller’s inability to deliver merchantable title within the time stipulated ... shall render this Agreement null and void, reserving unto Buyer the right to demand the return of the deposit.” The Contract states that Dr. Ditta could not require Scurlock to buy the property absent merchantable *61 title—a suspensive condition. Therefore, [Mr.] Scurlock had no obligation to buy because Dr. Ditta’s suspensive condition (delivering merchantable title) never occurred.
On appeal, Appellants contend that Dr. Ditta’s obligation to deliver merchantable title was not a suspensive condition; rather, they contend it was a resolutory condition. See Humble Oil & Refining Co. v. Lewis, 245 La. 499, 159 So.2d 132 (1963). For this reason, they contend that the trial court erred in failing to find the Email constituted an anticipatory breach. We find it unnecessary to resolve the legal question of whether providing merchantable title at closing is properly classified as a suspen-sive, as opposed to a resolutory, condition.[6] Rather, we find the principle of retraction applies here,
Even assuming, arguendo, the Email was an anticipatory breach (repudiation), we find the repudiation was retracted before Dr. Ditta changed her position in reliance on it. At trial, Dr. Ditta acknowledged that after the Email, she was in contact with Mr. Scurlock by text (or by phone) and that he expressed his interest in consummating the transaction. Dr. Ditta explained that she and Mr. |nScurlock had each other’s cell phone numbers, and they texted each other “all the time” during the period at issue. Dr. Ditta admitted that after the Email, Mr. Scurlock texted her that he “so want[s] this transaction to close” and “yes I want the house.”
Mr. Scurlock’s testimony tracked Dr. Ditta’s testimony on this point. He explained that he communicated—usually by text—with Dr. Ditta multiple times after the Email. He testified that after the Email, he reassured Dr. Ditta that he wanted to purchase the Property and that he texted her that he wanted the transaction to close. He also recalled texting her on the day before the closing that he wanted the Property. Moreover, he testified that after the Email, he instructed Mr. Potts to move forward with the closing. He further testified that if Mr. Potts had confirmed to him the title was clear as of the closing date, he would have purchased the Property.
The record reflects that after the Email, both sides continued to work towards the closing. Dr. Ditta continued her efforts to secure and to record the boundary agreements; Mr. Potts continued to prepare for the closing and attended it, albeit only to prepare a procbs verbal. Given these circumstances, even assuming the Email was an anticipatory breach (repudiation), the renunciation was retracted before Dr. Dit-ta changed her position in reliance on it. Appellants’ reliance on the doctrine of anticipatory breach is thus misplaced.

Merchantability of title

Resolution of this case thus turns, as the trial court held, on whether Dr. Ditta delivered merchantable title at the August 26, 2013 closing. Resolving the issue in Mr. Scurlock’s favor, the trial court found that Dr. Ditta failed to deliver merchantable title because the fence encroachments were suggestive of future 112litigation. On *62 appeal, Appellants contend that the trial court erred in finding that the Property was not merchantable, legally and factually- .
Legally, Appellants contend that the trial court seemingly applied century-old case law that “[o]ne should not be made to accept a title tendered as good, valid and binding unless it is entirely legal from every point of view.” Bodcaw Lumber Co. v. White, 121 La. 715, 721, 46 So. 782, 784 (1908). They contend that the antiquated standard of merchantability the trial court seemingly relied upon of “perfect title, free of all technical defects” is not the law. Rather, they contend the law is the “less stringent standard” enunciated by this court in Bart v. Wysocki, 558 So.2d 1326, 1328-29 (La. App. 4th Cir. 1990).
Mr. Scurlock counters that the trial court, both in its denial of Dr. Ditta’s motion for partial summary judgment and in its reasons for judgment, recited the following oft-cited, hornbook standard of merchantability:
Property has a merchantable title when"'it can be readily sold or mortgaged in the [ ^ordinary course of business by reasonable persons familiar with the facts and questions involved. Roberts v. Medlock, 148 So. 474 (La. App. [2d Cir.] 1933). ‘[O]ne should not be made to accept a title tendered as good, valid and binding unless it is entirely legal from every point of view.’ Bodcaw Lumber [Co.] v. White, 121 La. 715, 46 So. 782, 784 (1908). The promisee in a contract to sell is not called upon to accept a title which may reasonably suggest litigation. Marsh v. Lorimer, 164 La. 175, 113 So. 808 (1927). And while the amount may be small, ‘it cannot be said that because of this fact the danger of litigation is‘not serious. Young v. Stevens, 252 La. 69, 97, 209 So.2d 25, 35 (1967). No one can be forced to buy a lawsuit.’ Id.
Continuing, Mr. Scurlock notes that the Bart case cites with approval the Supreme Court’s Young case. Moreover,. the Bart case recites the same merchantability principles discussed in the trial court’s reasons for judgment. For instance, the Bart case repeats verbatim the statement the trial court quoted from Roberts, supra, that “[property has a merchantable title when it can be readily sold or mortgaged in the ordinary course of business by reasonable persons familiar with the facts and questions involved.” The Bart case also quotes the “reasonably suggestive of litigation” language, citing in support the Marsh case. Thus, Mr. Scurlock submits that the legal standard applicable to this dispute on merchantability cannot be disputed. We agree.[7]
In the Bart case, this court summarized the legal standard of merchantability as follows: .
Property has a merchantable title when it can be readily sold or mortgaged in the ordinary course of business, by reasonable persons familiar with the facts and questions of law involved. Vallery v. Belgard, 379 So.2d 1201, 1204 (La. App. 3[rd] Cir. 1980); Langford Land Co. v. Dietzgen Corp., 352 So.2d 386, 388-389 (La. App. 4 Cir. 1977).
Title does not become unmerchantable merely because litigation is possible, but only when'the title is reasonably suggestive of future litigation. Langford Land, supra, 352 So.2d at 388.
Title is deemed unmerchantable only when there are outstanding rights in a third person of a substantial nature *63 against the property, subjecting the vendee to servious [sic] litigation. Langford Land, supra, 352 So.2d at 388.
In the Langford Land case, this court relying upon earlier jurisprudence defined merchantable title as:
... one which can be readily sold or mortgaged in the ordinary course of business, to a reasonable person .familiar with the facts and appraised of the question of law involved. It need not be free from every technical defect, of all suspicion, or the possibility of litigation. It must be a record title free of rational substantial doubt to the extent that a purchaser should feel that he can hold his purchase in peace without the probability of attack and with reasonable assurance that it will be readily salable on the open market, (citations omitted).
The word “merchantable” implies something less than a perfect title and permits of defects which are not I ^/reasonably liable to result in assault. 352 So.2d at 388 quoting from Roberts v. Medlock, 148 So. 474, 476 (La. App. 2[d] Cir. 1933). (emphasis supplied)
558 So.2d at 1328-29.
As Appellants emphasize, the party who seeks to demonstrate that a title is unmerchantable has the burden of proof at trial. Langford Land, 352 So.2d at 388 (holding that “where one seeks to demonstrate that a title is unmerchantable as suggestive of litigation, he bears the burden of proof, as in any other usual litigation.”). Here, Mr. Scurlock, as the party seeking to demonstrate the Property was unmerchantable, had the burden of proof. The trial court found he satisfied that burden. In so finding, the trial court noted that “[t]he alleged encroachments totaled to an amount of .006% of the entire 18,000 square feet of the property.” The trial court, nonetheless, determined that “Dr. Ditta’s property was not merchantable because the fence encroached, in some places up to twenty-four inches, onto the adjoining private properties,” and Dr. Ditta’s attempt to execute valid boundary agreements with the neighboring property owners to cure the fence encroachments was insufficient.
Mr, Scurlock contends that the trial court correctly held that Dr. Ditta’s title to the Property was unmerchantable on the closing date because, as of that date, there was a fence encroachment—“a substantial wrought-iron fence, set in concrete, encroached onto three neighboring properties as much as two feet.” Indeed, he emphasizes that Dr. Ditta had previously filed an undisclosed boundary action involving her property line—the 2005 Lawsuit,[8] and both she and her 11srieighbor claimed ownership of the same land. As of the closing date, the 2005 Lawsuit was unresolved. Continuing, Mr. Scurlock contends that Dr. Ditta attempted, but failed, to resolve the fence encroachment issues by entering into boundary agreements with the neighbors on three sides of her property. Those three boundary agreements were defective and did not adequately resolve the encroachments for a number of reasons, including the following three:
(a) The boundary agreement concerning [Dr.] Ditta’s uptown-side/western neighbor (i.e. the same property in *64 volved in the 4S Investments lawsuit) was defective in a number of respects, including that none of the condominium unit owners had executed the boundary agreement. Rather, a non-unit owner executed a boundary agreement on behalf of the condominium association, which had no ownership interest in the property;
(b) [Dr.] Ditta had not presented sufficient evidence regarding ownership of the neighboring properties onto which ' [Dr.] Ditta’s fence encroached; and
(c) There were multiple judgments and other creditors and mortgage companies that held mortgages on the adjacent properties. It was necessary for [Dr.] Ditta’s neighbors’ creditors and mortgage holders to sign off on the boundary agreements through a release or subordination; otherwise, if a foreclosure were to occur, it would void a given boundary agreement. Accordingly, [Dr.] Ditta’s title was unmerchantable on the closing date.
In finding the Property was not merchantable, the trial court, agreeing with Mr. Scurlock’s contentions, cited the following three factors: (i) “there were other creditors and mortgage companies that held mortgages on adjacent properties ... [who] were not privy to any boundary agreement;” (ii) “questions ... existed regarding the agreements with the neighboring condo[minium] association;” and (iii) the 2005 Lawsuit was never resolved. We separately address each category.
|1fiAs to the first factor, the trial court reasoned that the boundary agreements were insufficient because there were other mortgages and encumbrance on the adjoining properties. The trial court further reasoned that “[t]he creditors were not privy to any boundary agreement and the Court finds that it was necessary for these creditors and mortgage holders to approve the boundary agreements through either a release or subordination.” Appellants contend that the trial court erred in finding the creditors or mortgage companies needed to approve the boundary agreements through a release or subordination. We disagree.
As Mr. Scurlock points out, two of the three adjoining properties had first-ranking mortgages or encumbrances. He further points out that there is no evidence in the record that “[Dr.] Ditta, or anyone else acting on Ditta’s behalf ever attempted to obtain releases or subordinations of the various mortgages and encumbrances.” Mr. Scurlock’s expert, Shaun B. Rafferty,[9] testified that the fence encroachment issues were not adequately resolved given the existence of several mortgages and encumbrances that primed the boundary agreements. He thus stated that “[i]t doesn’t do any good to get an owner to sign a waiver if you don’t get his mortgage company to do it.”
The second factor is the problems with the condominium boundary agreement. On this issue, the trial court reasoned that “there were questions as to whether the *65 condo[minium] association followed its own internal rules on how the |17condo[minium] owners could assign their rights (to execute the boundary agreement with Dr. Dit-ta) over [to] the condo[minium] association President.” The trial court thus noted that it had “concerns with whether the condominium agreement was valid.” Appellants contend that it is unknown why the condominium unit owners could not authorize the association’s president, Ms. Gladden, to execute the condominium boundary agreement.
At trial, Mr. Rafferty opined that there were numerous deficiencies, including form and authority, regarding the condominium boundary agreement. The first deficiency he noted was that the condominium’s documents limited membership in the condominium association only to owners of the condominium units and required that the association’s president be an association member. Ms. Gladden, who signed the boundary agreement as the association’s “president,” admittedly was not a condominium unit owner and thus not an association member; she was only a spouse of a unit owner, Mr. Gladden. Mr. Rafferty explained that corporate law does not apply here. Mr. Rafferty thus testified that “[i]f I’m trying to set aside this boundary agreement I’m going to hang my hat on the fact that the resolution named her as the president and she wasn’t the president.”
Another deficiency Mr. Rafferty noted regarding the condominium boundary agreement was that it was executed by the wrong party—the condominium association. He explained that under the condominium declaration, “the common elements are owned in in division by the individuals.” He thus opined that each of the four condominium unit owners were required to execute his or her own boundary agreement with regards to his or her undivided percentage interest in the common elements.
| ^Disagreeing, Appellants’ expert (Mr. Person) testified that the condominium association owned the common elements and that the condominium association, as oppose to an individual unit owners, was the proper party to enter into the boundary agreement. He explained that “once the condominium regime is created then owners have relinquished their right and interest to separately act as to the condominium property.” The conflicting expert testimony on this issue was for the trier of fact to resolve. We cannot conclude the trial court was erroneous in finding there were questions regarding the validity of the condominium boundary agreement.
The third and final factor is the 2005 Litigation. On this issue, the trial court’s finding was as follows:
In addition, the boundary Dr. Ditta shared with the neighboring condominium units had a previous lawsuit that was never disclosed to [Mr.] Scurlock. ... And although the 2005 lawsuit was abandoned three years later [by virtue of the application of La. C.C.P. art. 561[10]], any purchaser of the property could potentially be buying himself or herself a lawsuit as that boundary dispute was never resolved. The fact that the fence encroachment actually resulted in previous litigation and that a valid boundary agreement was never executed, the Court concluded that Dr. Ditta never delivered merchantable title to [Mr.] Scurlock.
*66 Appellants contend the trial court erred in finding a legally abandoned lawsuit—the 2006 Lawsuit—presented an unresolved issue with respect to the Property’s title. According to Dr. Ditta’s testimony the 2006 Lawsuit arose after 4S Investments tore down the wooden portion of her fence that was built along the boundary between the two properties. Sometime after suit was filed, 4S Investments rebuilt the wooden portion of the fence in harmony with Dr, Ditta’s | ^original wrought-iron fence and chain wall that has been in existence on the boundary since at least 1928. After 4S Investments rebuilt the wooden portion of the fence between the two properties, Dr. Ditta testified that she informed her attorney that she no longer wanted to pursue the suit; she thus believed the 2006 Lawsuit had been dismissed. Appellants also emphasize that the trial court, in its reasons for judgment, found the 2005 Lawsuit was legally abandoned in 2008, yet simultaneously suggested that “the boundary dispute was never resolved.” Appellants contend that the trial court “erroneously believed that any purchaser of the subject property could potentially be buying a lawsuit in regards to this issue proposed in the abandoned lawsuit.”
Conversely, Mr. Scurlock contends, that the existence of the fence encroachments was not only “reasonably suggestive of litigation,” but also had resulted in litigation—the 2005 Lawsuit over the Property’s boundary. According to Mr. Scurlock, the very fact that Dr. Ditta filed a boundary action concerning the Property rendered her title unmerchantable until a final resolution of that boundary action and her encroachments onto her neighbors’ property. Mr. Scurlock points out that in the 2005 Lawsuit, the defendant-neighbor answered the suit by claiming ownership of the property in dispute (the area onto which Dr. Ditta had encroached). Hence, both’ Dr. Ditta and her neighbor claimed ownership of the same land. Mr. Scurlock notes that the Civil District Court of New Orleans record of the 2005 Lawsuit reflects that the case has never been resolved. We find no error in the trial court’s finding that “[t]he fact the fence encroachments actually resulted in previous litigation and that a valid boundary agreement was never . executed” supports a finding that the title was ■not merchantable.
laoln sum, we find no error in the trial court’s reliance on the above three factors to support its finding that title to the Property was not merchantable on the date of the closing. All three factors support a finding that there were fence encroachments remaining on the Property as of the closing date. “Encroachments are held to be suggestive of litigation. When improvements or fences encroach a neighboring property, or when improvements or fences on neighboring property encroach on the property sold, the title is unmer-chantable because it is suggestive of litigation (Young v. Stevens, 252 La. 69, 209 So.2d 25 (1967); Morrison v. Fineran, 397 So.2d 838 (La. Ct. App. 4th Cir. 1981)) even if the encroachments are rather small. Clesi, Inc. v. Quaglino, 137 So.2d 500 (La. Ct. App. 4th Cir. 1962).” 1 Peter S. Title, LA. PRAC. REAL EST. § 9:65 (2d ed. 2016). “This rule is justified, as the Supreme Court enunciated in Young v. Stevens, 252 La. 69, 209 So.2d 25, 28 (1967), on the ground that peace of mind is in itself cause of an agreement to purchase property, and no one relishes the prospect of a suit with one’s neighbor.” Id.
On a different note, Appellants contend that the trial court erred in failing to admit and consider evidence of “salability” of the Property, which they contend is another factor to be considered in determining merchantability. Appellants note that the trial court refused to allow them *67 to introduce nearly a century of yalid sale agreements and mortgages related to the Property; however, they proffered the evidence showing over ten different sales of the Property.
To establish salability, Appellants also introduced evidence at trial that the Property was sold to a third party, Mr. Dean, less than two years after Mr. Scurlock’s alleged breach of the Agreement. They stress that the Property was sold to Mr. Dean without any further curative efforts to the title being made. Appellants | ¾1 also point out that Mr. Dean was able to obtain title insurance and a mortgage on the Property and that he has peacefully owned the Property since he purchased it from Dr. Ditta in 2015. Appellants contend that the trial court erred in failing to take judicial notice of the lack of any lawsuits against Mr. Dean since he purchased the Property. See La. C.E. Art. 201 (providing for the taking of judicial notice of adjudicative facts generally).
Finally, Appellants proffered an email from a senior underwriter at First American Insurance company, which stated “[a]f-ter a review of the surveys provided, I am willing to authorize the issuance of an owner’s policy without' exception to the de minimus encroachments on the 3711 St. Charles property.”
The gist of Appellants’ argument is that the trial court erred in failing to consider the evidence of salability and insurability of the Property. Appellants’ reliance on the concepts of salability and insurability is misplaced. The narrow issue is merchantability. The jurisprudence, as a commentator points out, has held that a merchantable title is distinguishable from insurable title. 1 Peter S. Title, LA. PRAC. REAL EST. § 9:62 (2d ed. 2016); this distinction is explained as follows:
A merchantable title imposes a higher standard than an insurable title. A title insurance policy is not equivalent to a merchantable title in Louisiana; title insurance is an agreement by an insurer to satisfy claims against the property. The purchaser is entitled not only to the protection of indemnity against claims, but also against claims being made. Makofsky v. Cunningham, 576 F.2d 1223 (5th Cir. 1978). Furthermore, a title insurance policy is limited in coverage to the amount stated on its face, and would not protect the purchaser in the event of loss suffered in excess of this sum. This could easily occur if the purchaser made improvements on the property, or if the land or improvements increased in value over the years. However, parties sometimes agree that the purchaser can be compelled to accept a title that is insurable for the full amount of the purchase price without exception by a title insurance company, regardless of whether the title would be deemed “merchantable” under law.
| By extension, the same principles apply, and distinguish, a salable title from a merchantable one. Again, the narrow issue is merchantability, not salability or insurability.
In. conclusion, the record supports the trial court’s factual finding that the title was not merchantable on the date of the closing given the existence of fence encroachments. Given the evidence presented at trial, we find the record supports the trial court’s implicit factual finding that there was sufficient danger of litigation and enough uncertainty as to what the buyer—Mr. Scurlock—would receive by the. conveyance to justify the buyer’s refusal to close the transaction; and this was a failure of the seller—Dr. Ditta—to deliver merchantable title at closing. Indeed, Mr. Scurlock’s expert, Mr. Rafferty, testified that he would have raised the same exact issues regarding merchantability of the ti- *68 tie to the Property that Mr. Potts raised in his title commitment regarding the fence encroachments and that he would have provided his client with the same information and advice as Mr. Potts provided Mr. Scurlock—that the Property was not merchantable due to the fence encroachments. According, we find no manifest error in the trial court’s finding that Dr. Ditta failed to deliver merchantable title on the date of the closing.
DECREE
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED

. In 2005, Dr. Ditta filed a boundary action against one of her neighbors. As the trial court noted in its reasons for judgment, Dr. Ditta "testified that a dispute arose between her and her neighbor [apparently 4 S Investments, LLC] when that neighbor tore down the fence that separated the two properties. [Dr.] Ditta responded by filing a boundary action against her neighbor, who was developing condominiums on the property at the time.” At the time of trial, the 2005 Lawsuit had not been dismissed.

. On August 9, 2013, the Amelia Street boundary agreement was executed; Dr. Ditta paid the owner $1,000. On August 19, 2013, the Peniston Street boundary agreement was executed; Dr. Ditta paid the owner $2,000. The St. Charles Avenue boundary agreement—also referred to as the condominium boundary agreement—was executed on August 20, 2013. The owners of the four units each executed documents authorizing the condominium association’s president, Paula Gladden, to enter into the boundary agreement on his or her behalf. The trial court noted that "[t]he agreement between Dr. Ditta and the condo association also prevented the condo owners' heirs (and assigns) to waive any future attack on the property’s boundary line.” Dr. Ditta paid the condo association $2,838.

.Appellants’ assignments of error are as follows:
1. The District Court’s ruling effectively nullifies the cause of action of anticipatory breach despite decades of well-established jurisprudence.
2. .The District Court erred in ruling that Dr. Ditta’s performance under the Purchase Agreement was necessary in order for Mr. Scurlock’s August 18, 2013 e-mail to be sufficient for an anticipatory breach.
3. The District Court erred in ruling that Mr. Scurlock did not anticipatorily breach the Purchase Agreement.
4. The District Court erred in' ruling that Mr. Scurlock was not in breach of the Purchase Agreement when he failed to attend the Act of Sale.
5. The District Court erred in ruling that Mr. Scurlock carried his burden of proof in establishing that the title to the subject property was not merchantable.
6. The District Court erred in ruling that the boundary agreements were not valid. "
7. The District Court erred in ruling that the title to the subject property was reasonably suggestive of future, serious litigation from third parties of substantial nature,
. 8. The District Court erred, in effectively ruling that the title must be perfect title.
9. The District Court erred when it failed •to admit and consider evidence of the hundreds of years of salability and mortgagability of the subject property.
10. The District Court erred when it failed to take judicial notice of the non-existence of any litigation with regards to the boundaries of subject property.
11.- The District Court erred in ruling that Mr. Scurlock was entitled to the $100,000 deposit and no damages • were owed under the Purchase Agreement.

. See Andrew Development Corp. v. West Es *60 planade Corp., 347 So.2d 210, 212-13 (La. 1977) (holding that "[w]here a party refuses and does not merely fail or neglect to comply with his contractual obligation, his refusal constitutes an active breach of the contract, which relieves the other party of the obligation of continuing to perform under the contract.”), sea also Ringel & Meyer, Inc. v. Falstaff Brewing Corp., 511 F.2d 659, 660 (5th Cir. 1975) (noting that "[t]he concept of anticipatory breach is an alien engraftment upon Louisiana’s essentially civil-law system.”).

. See also Restatement (Second) of Contracts § 256(1) (1981) (providing that an anticipatory repudiation may be "nullified by a retraction of the statement if notification of the retraction comes to the attention of the injured party before he materially changes his position in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final”).

. Although Humble suggests it is a resolutory condition, the dissent in the Humble case voiced a different view. Humble, 245 La. at 511, 159 So.2d at 136 (McCaleb, J., dissenting) (noting that "[t]his is patently a suspen-sive condition, which is defined by Article 2043 of the Civil Code, inter alia, as one depending on a future and uncertain event.”); see also Bielawski v. Landry, 397 So.2d 861 (La. App. 4th Cir. 1981) (holding that the obligation to produce a merchantable title under a Buy-Sell Agreement was a suspensive condition); Schroeder v. Krushevski, 186 So.2d 640, 643 (La. App. 4th Cir. 1966) (holding that "by the terms of the contract his delivery of a merchantable title was a suspen-sive condition”).

. Regardless, we review judgments, not reasons for judgment. State through Dep't of Children & Family Servs. Child Support Enf't, 16-0979, p. 24, 216 So.3d 130, 139.

. In connection with the Purchase Agreement, Dr. Ditta, as the seller, completed a disclosure statement. One of the questions on the disclosure statement was "[i]s there any pending litigation regarding the property? Although Dr. Ditta originally checked "yes,” she crossed it out and changed her answer to "no.” Shortly before the original closing date, Mr. Potts discovered the undisclosed 2005 Lawsuit. In his July 25, 2013 email to Dr, Ditta's attorney, Mr. Potts expressly mentioned the 2005 Lawsuit.

. At trial, both Mr. Scurlock and Dr, Ditta presented an expert in the areas of title examination and merchantability of title to immovable property in the New Orleans, Louisiana area. The trial court qualified both Mr. Rafferty, Mr. Scurlock’s expert, and Eric O. Person, Dr. Ditta’s expert, as experts in those areas. Mr. Person testified that a ‘‘smell” test applies to determine merchantability. Mr. Rafferty testified that he would have raised the same exact issues regarding merchantability of the title to the Property that Mr. Potts raised in his title commitment and that he would have provided his client with the same information and advice as Mr. Potts provided Mr. Scur-lock—that the Property was not merchantable on the date of the closing.

. Article 561 provides that a suit "is abandoned when the parties fail to take any step in its prosecution or defense in the trial court for a period of three years.” La. C.C.P. art. 561 A(l). It further provides that "[t]his provision shall be operative without formal order” La. C.C.P. art. 561 A(3).