*275
 
 PER CURIAM.
 
 *
 

 I , Finding the Court of Appeal erred in concluding the Lafayette Housing Authority (LHA) breached Kathy Prejean’s employment contract by firing her, we grant this writ solely to clarify the proper legal effect of LHA’s termination of Prejean’s employment.
 

 
 *276
 
 On February 15, 1995, by written contract, the Broussard Housing Authority (BHA) hired Prejean as executive director of its Section 8 Housing Program
 
 [1]
 
 for an initial five-year term, with an extension period of another five years.
 
 [2]
 
 Thereafter at HUD’s request, the BHA consolidated with the Vermillion Parish Section 8 Housing Program. In conjunction with the consolidation, Prejean drafted
 
 [3]
 
 an addendum to her employment contract, which the BHA accepted by resolution passed on January 3, 2002, and which provided, in pertinent part:
 

 1-That the [BHA] hereby retains and employs Kathy Prejean to be its Executive Director for a term of four (4) years commencing with the
 
 1st
 
 day of
 
 January, 2002
 
 and expiring
 
 January 1, 2006.
 
 In addition, it is further agreed by the parties hereto that this contract shall be extended Lfor an additional four (4) years (the “extension period”) upon the same terms and conditions at the option of [Prejean], unless the [BHA] gives [Prejean] by
 
 October 1, 2005,
 
 notice in writing that it will not extend the contract due to the inadequate performance of [Prejean]. The Board may make a finding of inadequate performance, after providing [Prejean] with written notice and an opportunity to be heard, upon a determination that a significant adverse audit finding (or adverse management review) by federal or state funding agencies has gone uncorrected for more than sixty (60) days due to action or inaction by [Prejean].
 

 2-That [Prejean] hereby accepts employment and hereby agrees that for the consideration hereinafter set forth, he/ she shall perform the duties as the Executive Director in conducting the business of said [BHA] and perform the duties of Secretary to the Board Members at their regular, special and annual meetings.
 

 In early 2004, without Prejean’s knowledge, the BHA decided to transfer its Section 8 Housing Program to the LHA. On April 13, 2004, the BHA held a public meeting at the City Hall in Broussard, Louisiana, where it approved a resolution for the transfer. Several members of the LHA, including its executive director, Walter Guillory, were in attendance. After the passage of the resolution, the LHA members briefly left the meeting and conducted their own meeting, wherein they voted to accept the BHA’s offer. Shortly thereafter, the LHA members returned to the BHA meeting to convey their acceptance.
 

 Immediately following the adjournment of the BHA meeting, members of the BHA and LHA, along with Guillory, proceeded to the BHA office in Broussard. There a confrontation occurred between Guillory and Prejean concerning the keys to the office, which Prejean refused to relinquish to Guillory, for the purpose of securing the building to commence a final audit of the BHA’s financial records. Eventually, Pre-jean and her staff left the building. That evening Prejean contacted the HUD offices in New Orleans. Upon returning to the BHA office the next morning, Prejean discovered the locks had been changed. After a phone conversation in which HUD officials, Prejean, and Guillory participat
 
 *277
 
 ed, Guillory gave Prejean the new keys to |sthe building and left. Prejean then had the locks re-changed.
 

 That same day, Dominick Pittari, the New Orleans HUD Director, wrote the BHA’s chairperson advising the BHA and the LHA had to comply with the provisions of La.Rev.Stat. § 40:411
 
 [4]
 
 for the transfer. In response, the LHA and the BHA filed a joint petition for a declaratory judgment ruling La.Rev.Stat. § 40:411 did not apply to the transfer, which petition the district court granted on August BO, 2004.
 

 On October 5, 2004, Prejean filed suit against Guillory and the LHA for damages resulting from the “hostile takeover” of the BHA by the LHA. In her petition, Prejean sought “a permanent injunction prohibiting GUILLORY from invading her privacy, slandering her, harassing her or damaging her,” and
 
 “a
 
 declaratory judgment that her employment contract with [BHA] is valid and enforceable and will become the lawful obligation of the [LHA][, according to its terms] after any formal consolidation occurs.”
 

 By November 2004, with HUD’s approval of the transfer, Guillory assigned Tim Declouet to head the Broussard office. That same month, Prejean was diagnosed with cancer of her right breast, for which she underwent a mastectomy. By note dated November 2, 2004, Prejean’s physician stated Prejean was scheduled for surgery on 14 November 3, and excused her from work until November 22, 2004. By note dated November 11, 2004, Prejean’s physician explained Prejean was scheduled for surgery on November 17, 2004, and would return to work after four weeks. Prejean was released to work on January 10, 2005, by noted dated December 9, 2004. In February 2005, Prejean was diagnosed with cancer of the left breast, for which she underwent a second mastectomy. By note dated February 10, 2005, Prejean’s physician excused her from work for eight weeks following her surgery scheduled for February 16, 2005. Prejean was released to work on May 2, 2005, by her physician’s note dated March 29, 2005, but that release date was extended to July 25, 2005, as stated in her physician’s note dated April 25, 2005.
 

 On May 16, 2005, Prejean was called by her staff to the Broussard office regarding the presence of IRS agents inquiring about the BHA’s third quarter 941 Form, which should have been filed in late December of 2004 or early January of 2005. By May 17, 2005, Prejean had remedied the situation by filing the necessary form with the IRS.
 
 [5]
 

 
 *278
 
 During that same month, Guillory, with knowledge of Prejean’s illness, looked into the Prejean’s medical file with the LHA’s human resources department, which contained her physician’s notes, and discovered Prejean was excused from work until July 25, 2005. He then brought her absenteeism to the attention of the LHA’s Board of Commissioners. On May 17, 2005, the LHA passed a resolution to terminate Prejean due to excessive absences and sent Prejean a letter informing her of her | ¡¡termination effective May 31, 2005. The letter, dated May 17, 2005, stated:
 

 RE: Permanent Termination
 

 Please be advised that the Lafayette Housing Authority Board of Commissioners voted unanimously in favor of terminating your employment for failure to perform effective May 31, 2005. Enclosed you will find a copy of the resolution, background, and a check for May 2005.
 
 [6]
 

 The Board’s decision is based on your being absent from your position of employment for over sixty (60) continuous days and uninterrupted days after exhausting all sick and annual leave days. During your absence you did not contact this Board to make any type of arrangements concerning your continued and interrupted absence from work.
 

 In her First Supplemental and Amending Petition filed on February 22, 2008, Prejean sought damages for the LHA’s breach of her employment contract by its wrongful termination of her employment.
 

 Following a four-day bench trial, the District Court dismissed Prejean’s claims based on her failure to carry her burden of proof regarding any negligence by the LHA or Guillory as well as to her entitlement to enforce her employment contract against the LHA. Finding legal error in the District Court’s failure to apply the provisions of La.Rev.Stat. § 40:417,
 
 [7]
 
 the Court of Appeal, Third Circuit, reversed |fithe district court’s judgment on appeal.
 
 Prejean v. Guillory,
 
 09-495 (La.App. 3 Cir. 1/13/10), 28 So.3d 1174.
 

 
 *279
 
 Conducting a de novo review of the record, the Court of Appeal concluded Preje-an had a valid and legal employment contract with the BHA, and by operation of La.Rev.Stat. § 40:417(B), the LHA was responsible for honoring the contract. The appellate court further found Prejean carried her burden to prove the LHA breached that contract by firing her, and the LHA failed to carry its burden to prove Prejean had breached the contract by performing her job inadequately due to excessive absenteeism or otherwise. Therefore, the Court of Appeal concluded Prejean was entitled to recover under the terms of her employment contract from the LHA through December 2009, and rendered judgment accordingly.
 
 [8]
 

 See Prejean,
 
 09-495 at pp. 34-35, 28 So.3d at 1195-96.
 

 LAW AND DISCUSSION
 

 “[W]hen a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law.”
 
 Sims v. Mulhearn Funeral Home, Inc.,
 
 07-0054, p. 10 (La.5/22/07), 956 So.2d 583, 590. “Interpretation of a contract is the determination of the common intent of the parties.” La. Civ.Code art. 2045. The reasonable intention of the parties to a contract is to be sought by examining the words of the 17contract itself, and not assumed.
 
 Sims,
 
 07-0054 at p. 7, 956 So.2d at 589;
 
 McConnell v. City of New Orleans,
 
 35 La. Ann. 273 (1883). “When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent.” La. Civ.Code art. 2046. Common intent is determined, therefore, in accordance with the general, ordinary, plain and popular meaning of the words used in the contract.
 
 Louisiana Ins. Guar. Ass’n v. Interstate Fire & Cas. Co.,
 
 93-0911, p. 5 (La.1/14/94), 630 So.2d 759, 763. Accordingly, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit, as it is not the duty of the courts to bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties.
 
 See Maloney v. Oak Builders, Inc.,
 
 256 La. 85, 98, 235 So.2d 386, 390 (1970);
 
 McConnell,
 
 35 La. Ann. at 275. Most importantly, a contract “must be interpreted in a common-sense fashion, according to the words of the contract their common and usual significance.”
 
 Lambert v. Maryland Cas. Co.,
 
 418 So.2d 553, 559 (La.1982).
 

 With these basic principles in mind, we examine the relevant provisions of the contract at issue, particularly the extension provision, which as noted above provided in pertinent part: “That the [BHA] hereby retains and employs Kathy Prejean ... for a term of four (4) years ...
 
 expiring January 1, 2006.
 
 In addition, ... this contract shall be extended for an additional four ...
 
 unless
 
 the [BHA] gives [Preje-an] by
 
 October 1, 2005, notice in writing
 
 that it will not extend the contract due to the
 
 inadequate performance
 
 of [Prejean].” (Emphasis added).
 

 
 *280
 
 The language of Prejean’s employment contract is explicit. Prejean’s contract expired on January 1, 2006. However, the addendum also contained an extension period of four years, which would take effect
 
 unless
 
 the BHA provided Prejean | ^written notice of its intent not to extend the contract due to her inadequate performance by October 1, 2005.
 

 While the written notice provision posed no interpretative problems, the Court of Appeal took exception with the ambiguity of the phrase “inadequate performance.” However, in accord with the longstanding rules of contractual interpretation, the general, ordinary, plain and popular meaning of the words “inadequate performance” is insufficient fulfillment of an obligation according to its terms.
 
 See Webster’s New International Dictionary Unabridged,
 
 “Inadequate” (2d Ed.1955);
 
 Webster’s,
 
 “Performance”;
 
 Black’s Law Dictionary,
 
 “Inadequate” (6th Ed.1991);
 
 Black’s,
 
 “Performance.” Thus, under the terms of the contract at issue, Prejean’s employer could refuse to extend her contract due to her insufficient fulfillment of an obligation arising from her employment.
 

 The Court of Appeal was further critical of the sentence directly succeeding the extension provision and found it could not even determine whether a finding by the board of an adverse audit was the only form of inadequate performance justifying Prejean’s termination or whether the language was merely illustrative of inadequate performance. Under our civilian tradition, however, “may” is permission.
 
 Jacobs v. City of Bunkie,
 
 98-2510, p. 6 (La.5/18/99), 737 So.2d 14, 19;
 
 Underwood v. Lane Memorial Hosp.,
 
 97-1997, p. 4 (La.7/8/98), 714 So.2d 715, 717; La.Rev. Stat. § 1:3. Therefore, by the general, ordinary, plain and popular meaning of the word, this provision should be read as merely illustrative, not mandatory. Nevertheless, as the appellate court correctly noted, any ambiguity in a contract is construed against the drafter thereof.
 
 See Robinson v. Robinson,
 
 99-3097, p. 18 (La.1/17/01), 778 So.2d 1105, 1122;
 
 Williams Engineering, Inc. v. Goodyear,
 
 496 So.2d 1012, 1018 (La.1986). Because Prejean drafted the contract, inadequate performance by Prejean in |9any form would have justified her termination.
 

 Therefore, to prevent the activation of the extension period under the terms of the contract, the LHA, as the BHA’s successor, had to provide written notice of its intent not to extend the contract due to her inadequate performance. Through its letter dated May 17, 2005, the LHA provided Prejean with written notice of its intent not to extend her contract, clearly satisfying the addendum’s written notice requirement well within the October 1 deadline.
 

 Moreover, the record reflects three grounds upon which the LHA could have based its finding of inadequate performance. First, the record definitively shows Prejean was medically excused from work from November 2, 2004 through January 10, 2005, and from February 16, 2005 through July 25, 2005, both of which periods far exceeded the LHA’s uncontested two-week paid sick leave policy.
 
 [9]
 
 Significantly, the only records of
 
 *281
 
 Prejean’s attendance were the medical excuses contained in her LHA medical file, and Prejean conceded to “someone looking at [her] file the 110beginning of May, it would look like [she] hadn’t been at work from ... February 16th ... [a]nd [she wasn’t] scheduled to come back until July 25th.”
 
 [10]
 
 Therefore, based on her attendance record, the LHA had grounds for its finding of inadequate performance due to excessive absenteeism in that Prejean failed to fulfill her basic employment obligation of attendance. Second, according to the addendum’s second paragraph, Pre-jean “shall ... perform the duties of Secretary to the Board Members at their regular, special and annual meetings.” The record irrefutably shows Prejean never attended any LHA board meeting from April 2004 through May 2005, and, therefore, never performed her duties of secretary to the board at its meetings. Third, Prejean testified she was responsible for filing the BHA’s 941 Forms with the IRS, which she failed to do in January 2005, prompting a visit from the IRS to the BHA office in May of that year. Therefore, the record supports the LHA had grounds for finding inadequate performance on the part of Prejean in failing to sufficiently fulfill her contractual obligations and did not breach her contract by its termination.
 
 [11]
 

 We find, therefore, by its own terms, Prejean’s contract expired on January 1, 2006, upon written notice of the LHA of its intention not to extend her contract due to inadequate performance. Consequently, Prejean is entitled to judgment awarding her seven months of salary for June through December 2005, plus interest from the date of judicial demand. We render judgment accordingly. Further, we render judgment dismissing Prejean’s claims against Walter Guillory with full prejudice. The judgment of the Court of Appeal contrary to this holding is hereby reversed.
 

 
 *282
 
 InDECREE
 

 For the foregoing reasons, the judgment of the Court of Appeal finding Kathy Pre-jean was not properly terminated and awarding her salary through December 2009 is hereby reversed. Judgment is hereby rendered in favor of Kathy Preje-an, awarding her seven months of salary from June through December 2005, plus interest from the date of judicial demand. Further, judgment is hereby rendered against Kathy Prejean and in favor of Walter Guillory, dismissing with prejudice all claims against Guillory.
 

 REVERSED IN PART and RENDERED.
 

 *
 

 Kimball, C.J., did not participate in the deliberation of this opinion.
 

 [1]
 

 . Section 8 housing is a tenant-based program financed with vouchers consisting of federal funds through the Department of Housing and Urban Development (HUD) to provide suitable housing for tenants in homes offered by approved homeowners/landlords.
 

 [2]
 

 . Prejean actually began working for the BHA without contract in October of 1994.
 

 [3]
 

 . Prejean was assisted by Russell Moore from the New Orleans HUD office and by Kirk Davis, an attorney for HUD.
 

 [4]
 

 . La.Rev.Stat. § 40:411 provides:
 

 A. If the governing body of each of two or more parishes in the same general geographical location, regardless of their population, declares by resolution that there is a need for one regional housing authority for both or all of such parishes, a public body corporate and politic known as a regional housing authority shall thereupon exist and exercise its powers and perform its functions in such parishes.
 

 B. If the governing body of each of two or more municipalities, whether or not in the same general geographical location, declares by resolution that there is a need for one consolidated housing authority for both or all of such municipalities, a public body corporate and politic known as a consolidated housing authority shall thereupon exist and exercise its powers and perform its functions within its area of operation.
 

 C.Regional and consolidated housing authorities may select appropriate corporate names for themselves.
 

 [5]
 

 . On the facsimile transmittal letter, Prejean wrote the following note of explanation for the late filings:
 

 Yesterday I was told by IRS that the attach forms where [sic] not sent into there [sic] office. So this morning I went and turned in the 941 forms to I.R.S. [sic]. I
 
 *278
 
 was the one to do them before Lafayette Housing took over in Oct. 2004. But not a soul (person) ever gave them to me. At these times I was into the hospital battling the cancer. So I took care of there [sic] work for them.
 

 [6]
 

 . From April 2004 through May 2005, Preje-an’s salary was paid by check drafted from the BHA's bank account. However, from around November 2004 and onward, the checks were signed by Guillory and Jonathan Carmouche. Prior to that time, the checks had been signed by Prejean and the chairwoman of the BHA, Gertrude Batiste.
 

 [7]
 

 . La.Rev.Stat. § 40:417 provides:
 

 A. The governing body of a parish or municipality shall not adopt a resolution pursuant to the provisions of R.S. 40:411 or 413 if there is an existing housing authority therefor which has any obligations outstanding unless:
 

 (1) All obligees of the existing housing authority and the parties to its obligations consent in writing to the substitution of the regional or consolidated housing authority therefor on all such obligations.
 

 (2) The commissioners of the existing housing authority adopt a resolution consenting to the transfer of all the rights, obligations and property thereof to the regional or consolidated housing authority.
 

 B. When the two conditions in Subsection A are complied with and the regional or consolidated housing authority is created and authorized to exercise its powers and perform its functions, all rights, obligations and property of the former housing authority shall vest in the regional or consolidated housing authority and be in its name. All rights and obligations of the former housing authority shall be the rights and obligations of the regional or consolidated housing authority and may be asserted and enforced by or against the regional or consolidated housing authority as they might have been asserted and enforced by or against the former housing authority.
 

 [8]
 

 . Denying Prejean's request to remand the matter in order for her to prove further damages due her from the LHA’s breach, the appellate court found the record before it was complete and, under the clear terms of the contract, Prejean was entitled to judgment awarding her seven months of salary for the months of June through December 2005. For the years 2006 through 2009, the appellate court found Prejean was entitled to the total amount of her monthly salary, with the four percent annual cost of living increase for each year. However, the appellate court found Prejean failed to prove her entitlement to recover her car allowance or health insurance benefits.
 

 [9]
 

 . Contrary to the Court of Appeal's finding, the record contains no evidence Prejean did not exceed her two-week paid leave allotment. Of the three co-workers/employees, who testified on Prejean’s behalf, only Linda Anderson was employed during the "excused from work” time period in question, and although she testified Prejean came into work and work was delivered to Prejean's home, she did not know what Prejean's duties were nor could she say when or for how long Prejean was in the office during that period.
 

 
 *281
 
 Prejean, herself, testified she could not work full days during this period and admitted she was not in contact on the days of her surgeries or the three to four days thereafter:
 

 Two (2) weeks after my surgery in November, I was cutting the checks for the [BHA]. And I was doing my recertifications. And I was doing the input into the computer. I may not have stayed the full eight (8) hours, but I was at the office....
 

 [[Image here]]
 

 The only time I was not in contact is when I was undergoing surgery or recouping the three (3) to four (4) days after surgery.
 

 Moreover, given the numerous surgeries, follow up procedures, treatments, and doctors' visits Prejean endured and as documented in the medical excuses and records admitted into evidence, even viewing the testimony in a light most favorable to Prejean, a reasonable person could not find Prejean did not exceed her allotted sick leave time, at the very least during the latter six-month period.
 

 Additionally, LHA policy as testified to by both Prejean and Guillory required a person medically excused from work not be allowed to work for liability reasons. Prejean presented to the LHA numerous medical excuses in which her physicians ordered her not to work over a period of six months with each excuse further extending the prescribed "no work” period.
 

 [10]
 

 . Notably, the record is silent concerning any contact between the LHA and Prejean regarding arrangements for her continued absences, although Prejean did testified she asked Guillory, during her November 2004 assessment meeting held at his request, "for some time because I knew I was fixing to have another surgery.” Both Guillory and Prejean testified, however, they never met in 2005 regarding her job performance, her ability to perform, or her illness and medically necessitated leave time. The record is further silent regarding any discussion between Pre-jean, Guillory, or the LHA concerning her February diagnosis. Prejean admittedly did not seek extended leave under the federal Family Medical Leave Act.
 

 [11]
 

 . Finding no breach, we pretermit discussion of all other assignments of error.