Judgment rendered January 13, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,715-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

DONNIE PIERRE                                          Appellant

versus

KENNETH W. GARDNER                          Appellee
AND CANDICE B. GARDNER

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 586,586

Honorable Michael A. Pitman, Judge

* * * * *

DARYL GOLD                                          Counsel for Appellant

DONNIE PIERRE                                     Pro Se

SHUEY SMITH, LLC                              Counsel for Appellee
By: Richard E. Hiller

* * * * *

Before COX, STEPHENS, and THOMPSON, JJ.

**COX, J.**

This suit arises out of the First Judicial District Court, Caddo Parish, Louisiana. Donnie Pierre ("Ms. Pierre") appeals the trial court's denial of her anticipatory breach of contract, wrongful eviction action, and petition for damages against the property owners, Candice B. Gardner and Kenneth W. Gardner ("Mrs. Gardner, Mr. Gardner, the Gardners"). The trial court ruled in favor of the Gardners and concluded that the communications between the parties did not constitute an unequivocal repudiation or breach of the Lease-Purchase Agreement and as such, the Gardners acted within the scope of the Agreement. For the following reasons, we affirm the trial court's judgment.

## FACTS

On September 14, 2007, Ms. Pierre, her ex-husband, Mr. John Patrick May[1] ("Mr. May"), and the Gardners executed a *Lease-Purchase Agreement* (the "Agreement") whereby Ms. Pierre and Mr. May agreed to lease a 2.5-acre tract of land (the "Property") located on 5997 Highway 169 Hwy. North, Mooringsport, La. In accordance with the lease, the Property was priced for $74,800.00, was collectively comprised of two and a half lots, a manufactured home, and an additional subsidiary building near the end of the property line. The pertinent terms of the Agreement required Ms. Pierre to: 1) keep the Property in "good repair", 2) refrain from making renovations or improvements without the express written permission and approval of the Gardners, 3) maintain hazard insurance over the Property, and 4) pay annual property taxes.

---

[1] Mr. May is no longer a party to this suit on appeal. He has assigned all rights and interests that he may have in this suit to Ms. Pierre.

Further, because Ms. Pierre provided a nonrefundable $30,000.00 deposit, credited against the $74,800.00 purchase price,[2] the Agreement provided that Ms. Pierre and Mr. May would make 120 monthly payments of $592.04, each due on the 15th of each month beginning October 15, 2007, with the final payment due October 15, 2017. Any violation of the lease provisions or late payments would result in Ms. Pierre being placed into default; however, the parties verbally agreed that the Gardners could accept late payments and impose a penalty fee. The Agreement specified that the Property was encumbered by a mortgage to secure a home equity loan the Gardners executed with Capital One for improvements made to the land as well as the manufactured home. The Gardners warranted that the loan was less than $43,000.00, the loan was not in arrears, and that they would discharge the obligation as long as Ms. Pierre was not in default.

Ms. Pierre made payments to the Gardners directly or to Capital One to the credit of the Gardners. Mrs. Gardner accounted for each rental payment based, in part, on online statements from Capital One in an Excel spreadsheet she maintained as part of her ledger. These payments, since the beginning of the lease term and throughout the course of the lease, were either untimely, lacked the full rental amount, or overpaid, which gave a credit to Ms. Pierre at various times. This payment routine continued without issue between the parties, with Mrs. Gardner imposing late fees based on the amount Ms. Pierre was able to pay for a particular pay period. However, on August 6, 2014, Mrs. Gardner contacted Ms. Pierre through a

---

[2] After the initial down payment of $30,000.00, Ms. Pierre maintained a balance of $44,800.00 due over the course of 10 years.

Facebook message to inform her that based on a letter she received that: 1) Capital One discontinued all loans on single-wide mobile home properties, 2) the mortgage on the Property matured, 3) the balance on the mortgage would need to be paid in full by August 23, 2014, the date on which the loan matured, 4) she would be unable to satisfy and/or refinance the mortgage herself and, 5) that Capital One would "begin foreclosure steps soon."

From August 6 through August 8, 2014, the parties exchanged several messages discussing what steps would need to be taken with the bank and what the potential outcome would be if neither party would be able to finance the balance on the loan. At the conclusion of the messages, Ms. Pierre expressed her belief that because she was up to date on her rental payments with Mrs. Gardner, Capital One could not seize the Property from her. In the final response, Mrs. Gardner stated, "The bank has the title and owns the [P]roperty. They can call the note due in full at any time or take it. Ask an attorney, neither of us can do anything to stop the bank from making it have to be paid by when they say. Our attorney already looked at it, and said there is no way to stop foreclosure. But you should ask your own attorney."

On August 12, 2014, Ms. Pierre contacted Mrs. Gardner requesting a meeting with their attorneys and Capital One to resolve any issues with the Property. However, no response was ever made to this request and subsequently, communication between the parties ceased,[3] and the events

---

[3] Court records present conflicting testimonies in regards to any communication attempts made by either party concerning the state of the Property. At trial, Ms. Pierre testified that after she messaged Mrs. Gardner on August 12, Mrs. Gardner never responded, and ceased any and all communication with her. In contrast, Mrs. Gardner testified that after the August 12th message was sent, Ms. Pierre did not inquire further concerning the potential foreclosure. Nevertheless, Mrs. Gardner maintains she

surrounding the remaining 2014 payments resulted in the current suit. On August 15, 2014, Ms. Pierre deposited a MoneyGram[4] with Capital One to continue her lease payments, but made no further effort to contact Capital One about the potential foreclosure on the Property. Next, when Ms. Pierre attempted to make a September 15, 2014 payment in person, Capital One refused to accept her payments. Finally, Ms. Pierre left the Property in October with no payment made for that month and only paid $400.00 on November 24, 2014 for her November 15th payment. For each of the aforementioned payments, the Gardners imposed increased late fees until November 24, 2014, when they placed a five-day eviction notice on the Property.

Although Ms. Pierre was served with the *Petition of Eviction and Order* on December 8, 2014 and was aware that the eviction hearing was set for December 17, 2014, she failed to appear at the hearing.[5] At the hearing, a judgment of eviction was entered against Ms. Pierre and in favor of the Gardners. While Ms. Pierre did not contest the judgment entered against her at the hearing, she did file suit against the Gardners on August 4, 2015, for anticipatory breach of contract, seeking damages, namely, those rental obligations Ms. Pierre would have paid on for the remainder of the three years on the Property, as a result of the eviction. On January 4, 2019, the

---

continued to email Ms. Pierre payment summaries from Capital One and further testified that she messaged Ms. Pierre to inform her that there was no further information from Capital One.

[4] Although neither party contests that a payment was made for the August pay period, the amount in question is in dispute. Plaintiff's Exhibit 4 provides a copy of the MoneyGram in question; however, the quality of the copy makes it difficult to interpret for the exact amount paid.

[5] At trial, Ms. Pierre testified that she was not present at the hearing due to car trouble while en route from New Orleans.

Gardners filed a reconventional demand seeking sums due for all past due rental obligations and accelerated rent, and other damages the Property sustained.

At trial, both Ms. Pierre and Mrs. Gardner testified as to the events which resulted in the eviction and the subsequent litigation. At the conclusion of all testimony and evidence, the trial court found in favor of the Gardners, but denied damages for both parties. First, with respect to Ms. Pierre's claim for anticipatory breach of contract, the court noted that the August 6-8 thread of Facebook messages did not constitute an anticipatory breach of contract because there was no "express repudiation" of the lease under *Latter & Blum, Inc.* v. *Ditta*, 223 So. 3d 54 (La. App. 4 Cir. 2017). In that case, the Fourth Circuit found that the doctrine of anticipatory breach of contract "applies when an obligor announces he will not perform an obligation which is due sometime in the future." *Id.* Therefore, in order for the doctrine to apply, "evidence must be presented to show an express repudiation of the lease." *Id.* The messages, the court concluded, did not amount to an outright, unequivocal repudiation of the Agreement.

Specifically, the court noted that the Gardners "did not take any action contrary to the terms of the [A]greement," in that there is no evidence that the Gardners stopped payments on the mortgage or that they were in default. Further, with respect to the foreclosure, the letter sent by Capital One merely relayed that the balance on the loan was due, not that the Property was subject to foreclosure as Capital One never instituted any adverse action against the Gardners or sent correspondence indicating that foreclosure steps would or had begun. Although the messages between Mrs. Gardner and Ms.

5

Pierre indicated that Mrs. Gardner said the bank would begin foreclosure steps soon and that she would not be able to make payments by the indicated date, the messages only relayed Mrs. Gardner's concerns regarding the maturing of the loan and her "potential inability to satisfy" it. Therefore, the court concluded that Ms. Pierre's anticipatory breach of contract claim was without merit.

Second, with respect to the eviction which gave rise to Ms. Pierre's claim for damages, the trial court found the claim to be without merit. In accordance with the terms of the contract, the court determined that: 1) Ms. Pierre was required to make full and timely payments of $592.04 monthly on the 15th of each month, and if any payment was not made or paid when due, she would be in default, 2) her $30,000.00 deposit was nonrefundable and that "in the event of default by the Lessee, all monies paid shall be deemed as rent and shall be forfeited, and 3) under the "Default" lease provision of the Agreement, the Gardners maintained the option, in the case of default, to either seek specific performance and accelerate all rent installments or take immediate eviction and regain possession of the property. Based on the lease provisions, the trial court found that the Gardners had, at their option, to either seek all rental payments or evict Ms. Pierre upon default; they chose the latter; therefore, the Gardners were within the scope of the Agreement and the eviction was valid. Further, because Ms. Pierre was found to be default for nonpayment, she forfeited all rental monies and the Gardners, in electing eviction as their remedy, cannot seek payment from future rent.

Ms. Pierre now appeals.

## DISCUSSION

*Anticipatory Breach of Contract*

On appeal, Ms. Pierre specifies two assignments of error. First, Ms. Pierre argues that the trial court erred in finding that she was not entitled to damages because the Gardners anticipatorily breached the Agreement. Specifically, Ms. Pierre argues that Mrs. Gardner expressly repudiated her obligation to discharge the existing mortgage on the Property in the Facebook messages from August 6-8, coupled with the letter from Capital One and the Gardners' subsequent payment of the final loan payment to six months after the eviction notice was issued, constitute an anticipatory breach of contract, and actionable breach of contract.

In looking at the plain language of the Agreement, Ms. Pierre argues that the Gardners were unequivocally charged with the obligation to not only discharge all debts owed by them in favor of Capital One with respect to the mortgage encumbering the Property, but to indemnify and hold her "harmless regarding sums due and other obligations under said mortgage." In particular, this provision of the lease states:

> Seller warrants that they will discharge the obligation represented and imposed by said loan/line of credit in accordance with the terms and conditions of the recorded mortgage, all to the full discharge and acquittance of Buyers for so long as Buyers are not in default on the lease terms set forth herein.

Therefore, Ms. Pierre asserts that the language in the aforementioned provision clearly obligated the Gardners to pay the remaining balance on the loan when it became due. It is Ms. Pierre's belief that Mrs. Gardner anticipatorily breached the Agreement when she informed Ms. Pierre that Capital One required that the balance on the loan was due and that the

Gardners would be unable to pay the balance and Capital One would "begin foreclosure steps soon" unless Ms. Pierre could provide an additional $5,000.00 to extinguish the loan. In particular, Ms. Pierre asserts that the thread of messages indicated that Mrs. Gardner no longer had any intention of satisfying the balance and elected to let Capital One foreclose the Property.

Ms. Pierre further argues that although she, as a young woman, did not understand how the Gardners' failure to satisfy the loan balance would impact her ability to reside on the Property because she was current in all rental payments, she nevertheless attempted to meet with the Gardners, their attorney, and Capital One to "see if [they] could get [the situation] all figured out." Ms. Pierre argues that the Gardners understood clearly that Capital One had the option to foreclose on the Property, yet chose to evict Ms. Pierre and approximately six weeks later, paid off the balance in January of 2015. The totality of the Gardners' actions, Ms. Pierre concludes, constitutes an anticipatory breach of the Agreement.

The Gardners argue that the trial court correctly determined that there was no unequivocal repudiation of the Agreement which would constitute an anticipatory breach of contract. Particularly, the Gardners contend that the Facebook messages are insufficient evidence to support an express repudiation under the doctrine of anticipatory breach, which must be proven in order for Ms. Pierre to prevail. The Gardners note, as did the trial court and Ms. Pierre, that under *Latter & Blum, Inc. v. Ditta*, *supra*, the doctrine of anticipatory breach "applies when an obligor announces he will not perform an obligation which is due sometime in the future." *Id.* Thus, for the

8

doctrine to apply to the facts of any particular case, "evidence must be presented to show an **express repudiation** of the lease." *Ken Lawler Builders, Inc. v. Delaney*, 837 So. 2d 1 (La. App. 2 Cir. 8/14/02) (Emphasis added).

The Gardners contend that the Facebook messages merely signify Mrs. Gardner's concern and frustration, not an intent to cease payments for the loan. The Gardners contend that after Mrs. Gardner received the letter from Capital One, which indicated that the loan associated with the Property was no longer honored and the remaining balance would be due on August 23rd, and informed Ms. Pierre of the change in circumstances, she only expressed her worry about the future of the Property, the loan maturing, and her inability to satisfy the loan by the specified due date because she was no longer employed. In particular, Mrs. Gardner stated:

> Capital One no longer does loans of any kind on mobile home properties. The bank is requiring loan balance to be paid by August 23rd, which [is] the date the current [loan] matures [and] expires. We do not have the money, and as of July 1st, I no longer had a job. They are to begin foreclosure steps soon.

After this first message, Mrs. Gardner further informed Ms. Pierre that she attempted to work with Capital One to refinance their existing line of credit to not only protect herself, but Ms. Pierre as well:

> … We were told over and over by Capital One that the 10-year equity line from 2004 would be able to be refinanced and extended at its end. However, Capital One has stopped everything to do with mobile/manufactured homes. I talked to Capital One earlier today to try and get a hardship modification to extend the payout due date another few years or ever refinance the current equity loan into any kind of regular loan that Capital One might offer.

Such messages, the Gardners argue, clearly express that Mrs. Gardner herself was perplexed and confused that the bank that she conducted

business with for over 20 years would suddenly revoke its promise that the Gardners would be able to refinance their loan and that she attempted several avenues to keep the Property and allow Ms. Pierre to continue to reside there. Moreover, at no time during the course of these messages, did Mrs. Gardner expressly repudiate the Agreement, nor did Ms. Pierre present any evidence to suggest that Mrs. Gardner expressly renounced her obligation to pay the existing mortgage or that the Gardners failed to perform this obligation as required in the Agreement.

The Gardners argue that since neither Mrs. Gardner nor Capital One took any foreclosure actions, despite the bank's letter which specified that the balance was due soon, coupled with Mrs. Gardner's messages that only expressed that she was perplexed and worried by Capital One's actions, as well as Mrs. Gardner's desire to correct the situation, the Gardners thus assert that the trial court was correct when it determined that the messages were not an "outright, unequivocal repudiation" of the Agreement.

In our review of the facts of this case, we agree with the trial court that the Facebook messages did not constitute an anticipatory breach of contract. As noted by both parties, Louisiana courts have long since recognized the doctrine of anticipatory breach of contract. This doctrine "applies when an obligor announces he will not perform an obligation which is due sometime in the future." *Fertel v. Brooks*, 02-0846 (La. App. 4 Cir. 9/25/02), 832 So. 2d 297 (quoting *Gulf Coast Bank & Trust Co. v. Rick Granger Enters.*, 2001-0656 (La. App. 3 Cir. 10/30/01), 800 So. 2d 402 (quoting *B & G Crane Service, Inc. v. Aetna Cas. & Sur. Co.*, 586 So. 2d 710, 712 (La. App. 3 Cir. 1991)). Accordingly, "the oblige need not wait

until the obligor fails to perform for the contract to be considered in breach."
*Id*. The obligee can simply terminate. *Id*.

In the present case, Ms. Pierre claims the Facebook messages between the parties evidence an express repudiation of Mrs. Gardner to discharge the mortgage. Therefore, it must be determined whether the Facebook messages indicate Mrs. Gardner intended to breach the Agreement. In relevant part, Mrs. Gardner first stated:

> Capital One no longer does loans of any kind on mobile home properties. The bank is requiring loan balance to be paid by August 23rd, which [is] the date the current [loan] matures [and] expires. We do not have the money, and as of July 1st, I no longer had a job. They are to begin foreclosure steps soon.
>
> . . .
>
> … We were told over and over by Capital One that the 10-year [e]quity [l]ine from 2004 would be able to be refinance[d] [and] extended at it[s] end. However[,] Capital One has stopped everything to do with [m]obile/[m]anufactured homes. I talked to Capital One earlier today to try and get a "hardship modification" to extend the payout due date another few years or ever refinance the current equity loan into ANY kind of regular loan that Capital One might offer.

In evaluating the thread of messages exchanged between the parties, it cannot be said that Mrs. Gardner signified an intent to repudiate her contractual obligation to extinguish the mortgage with Capital One. We note that an anticipatory breach must be "a *refusal* to perform" a contractual obligation. *See, Andrew Dev. Corp. v. W. Esplanade Corp.*, 347 So. 2d 210 (La. 1977). (Emphasis added). Where a "party refuses and does not merely fail or neglect to comply with his contractual obligation, his refusal constitutes an active breach of the contract which relieves the other party of the obligation of continuing to perform under the contract." *Id*. at 212-13. "The princip[al] thesis of this doctrine is that an obligee has a cause of

11

action when an obligor's acts or omissions reduce his ability to execute, or signify his intent to repudiate, a contractual obligation." *Fairfield Dev. Co. v. Jackson*, 438 So. 2d 664, 671 (La. App. 2 Cir. 1983).

In the present case, Mrs. Gardner at no point in the Facebook exchange indicated that she refused to satisfy the loan balance on mortgage owed to Capital One. Rather, as the Gardners note, it appears she made several attempts to prevent the foreclosure. In particular, we note that Mrs. Gardner told Ms. Pierre that she spoke with the bank and tried to "get a hardship modification to extend the payout due date another few years or even refinance the current equity loan into any kind of regular loan that Capital One might offer." Further, Mrs. Gardner told Ms. Pierre that if she "had the money" she would have "paid it off" and had Ms. Pierre pay her back. At most, the messages can be interpreted as a notification to Ms. Pierre that Mrs. Gardner merely feared that she would not be able to perform her obligation due to financial difficulties. As such, the announcement cannot be characterized as an anticipatory breach of contract. *See Session Fixture Co., Inc. v. Pride Mktg. & Procurement, Inc.*, No. CV 16-9373, 2016 WL 7210349 (E.D. La. Dec. 13, 2016) (*quoting Ringel & Meyer, Inc. v. Falstaff Brewing Corp.*, 511 F.2d 659, 660 (5th Cir. 1975) ("So far as we know, no court, common-law or civil, has yet held that obvious incapability of performance due to financial difficulties constitutes anticipatory breach.").

Although Ms. Pierre argues that the failure to satisfy the remaining loan balance is a breach of the Gardners' obligation under the terms of the Agreement, we find that, as the trial court noted, the Gardners "did not take

12

any action contrary to the terms of the [A]greement," in that Ms. Pierre presented no evidence that the Gardners stopped payments on the mortgage or that they were in default. Further, neither Capital One nor the Gardners took any affirmative action to foreclose the property after the August 6-8 Facebook exchange. The letter Capital One sent merely relayed that the balance on the loan was due, not that the Property was subject to foreclosure because Capital One never instituted any adverse action against the Gardners or sent correspondence indicating that foreclosure steps would or had begun.

Further, in addressing Ms. Pierre's contention that she, unlike the Gardners, was unaware of the impact that the mortgage had on her rights as a lessee and any consequences thereof, as well as the Gardners' ability to satisfy the loan after the eviction as evidence of the breach, we find this argument to be without merit. First, Ms. Pierre attested at trial that she understood the terms of the Agreement when it was executed. That Ms. Pierre was unaware of the consequences of the mortgage on the Property is immaterial as she bound herself to the terms of the Agreement. Further, even if the Gardners were aware that Capital One had the option to foreclose on the Property, neither took any steps toward foreclosure. Accordingly, we find that Mrs. Gardner merely voiced a concern for her ability to perform, not an express repudiation that she would refuse to perform her obligation. Therefore, we find the Facebook messages between the parties did not constitute an anticipatory breach of contract.

*Wrongful Eviction*

For her second assignment of error, Ms. Pierre contends that the Gardners wrongfully instituted an eviction proceeding against her, primarily

13

because she was current in her rental obligations from September of 2007, when the lease term began, through August 1, 2014. Although Ms. Pierre acknowledges that throughout the duration of the lease there were several occasions in which she would either prepay her rental obligations or would make past-due payments, which were subject to late fees, the Gardners nevertheless accepted each payment. It is Ms. Pierre's contention that because the Gardners routinely accepted payments in such a manner, the punctuality of the lease payments, despite the original terms set forth in the Agreement, were amended. To this point, Ms. Pierre relies on the decision in *Himbola Manor Apartments v. Allen*, 315 So. 2d 790 (La. App. 3 Cir. 1975), in which the court noted:

> There is, however, a well-established general rule in the jurisprudence of this state that where a lessor-owner customarily accepts rental payments after the date on which they are due, such 'custom' by acquiescence of the parties, has the effect of altering the original contract in respect to the punctuality of the rent payments.
> . . .
> When such 'indulgences' on the part of the lessor are found to have created the abovementioned 'custom,' the landlord's right to strict enforceability of the lease rental provisions is considered waived, and in order to hold the lessee to the explicit terms of the lease, advance notice must be given of the lessor's intention in the future to strictly enforce the lease provisions and collect the rent as due.

Based on the decision rendered in *Himbola*, Ms. Pierre argues that since the Agreement was executed in 2007, she consistently made monthly payments of $592.04 to the Gardners for seven years; as such, whether the payments were timely is moot, given that the Gardners routinely accepted such payments. Moreover, Ms. Pierre argues that there were several accounting discrepancies and inconsistencies with respect to the verbally imposed late fees, as well as a failure to credit her for overpayments which

14

totaled approximately $131.12. Additionally, Ms. Pierre notes that she continued to make regular payments even after Mrs. Gardner informed her of the notice from Capital One, one of which, the bank refused to accept.

In contrast, the Gardners argue that the eviction proceeding against Ms. Pierre was proper because the Agreement specifically afforded the Gardners, as lessors, the option to evict Ms. Pierre if she was in default. The Gardners reiterate the trial court's conclusion that "under the plain and unambiguous lease provisions of the Agreement and [Ms.] Pierre's admission that she failed to make the regular monthly payments due on October 15th and November 15th, she was in default, and the Gardners were entitled to proceed with the eviction against her."

The Gardners then note that under La. C.C. art. 2045, contracts have the effect of law for the parties, and the interpretation of a contract is the determination of the common intent of the parties. The reasonable intent of the parties to the contract is sought through an examination of the words of the contract itself, and is never presumed. *Prejean v. Guillory*, 2010-0740 (La. 7/2/10), 38 So. 3d 274. Further, the Gardners cite La. C.C. art. 2046, which provides, when the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. As such, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit. *Malone v. Oak Builders*, 256 La. 85, 235 So. 2d 3 (1970).

Here, the Gardners aver that the language in the Agreement is clear and unambiguous and, therefore, must be enforced. They argue that the

lease provision unequivocally obligated Ms. Pierre to make monthly rental payments of $592.04, each of which was to be due on the 15th of each month and at trial, Ms. Pierre admitted that she failed to make the regular monthly payments for the months of October and November of 2014. Accordingly, the Gardners assert that the Agreement is enforceable and clearly provides that in the event of nonpayment, which occurred for two consecutive months, Ms. Pierre was required to be placed in default such that the Gardners were then afforded the option to proceed with the eviction against Ms. Pierre.

Given the facts of this particular case, we are inclined to agree with the trial court. First, we detail the general principles which govern leases, because the parties in this case were bound by a lease agreement. A lease is a synallagmatic contract which burdens both the lessor and the lessee with specified obligations. *See* La. C.C. art. 2668. In particular, lessors are obligated 1) to deliver that which is the subject of the lease to the lessee; 2) to maintain the object in a suitable condition; and 3) to maintain the lessee in peaceable possession for the duration of the lease. *See* La. C.C. art. 2682. In contrast, the lessee is obliged 1) to pay the rent pursuant to the terms of the lease; 2) to prudently administer the lease according to the lease terms; and 3) to deliver the object to the lessor. *See* La. C.C. art. 2683. Further, the particular terms of a lease "forms the law between the parties, defining their respective legal rights and obligations. The parties are bound by the agreement regardless of any harsh consequences contained in those agreements." *Lobell v. Rosenberg*, 2014-0060 (La. App. 4 Cir. 1/7/15) 158

So. 3d 874 (2015) citing *CA One/Pampy's v. Brown*, 2007-1377 (La. App. 4 Cir. 4/2/08), 982 So. 2d 909.

As such, we look to the specific terms of the Agreement to determine the rights and obligations of the parties with respect to rental payments and the consequences thereof for failure to make said payments. In interpreting the Agreement, we begin, as the Gardners note, from the general premise that "contracts have the effect of law for the parties" and the "[i]nterpretation of a contract is the determination of the common intent of the parties." *Clovelly Oil Co., LLC v. Midstates Petroleum Co. LLC*, 2012-2055 (La. 3/19/13), 112 So. 3d 187; quoting *Marion v. Exxon Mobile Corp.*, 2009-2368 (La. 10/19/10), 48 So. 3d 234, and La. C.C. arts. 1983 and 2045. The reasonable intent of the parties to a contract is to be sought by examining the words of the contract itself, and is not assumed. *Prejean v. Guillory*, *supra*. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. C.C. art. 2046. Common intent is determined, therefore, in accordance with the general, ordinary, plain and popular meaning of the words used in the contract. *Prejan v. Guillory, supra*. When a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit, as it is not the duty of the courts to bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties. *Id.*

In the present case, we find that the language of the Agreement plainly defines the rights and obligations of the parties concerning the

Property. The Agreement charged the Gardners, as the lessors, to extinguish

the existing mortgage encumbering the Property[6] and at the termination of

the lease, to deliver the Property to Ms. Pierre. Likewise, Ms. Pierre, as the

lessee, was bound to keep the Property in "good repair," refrain from

making renovations or improvements without the express written permission

and approval of the Gardners, maintain hazard insurance, pay annual

property taxes, and most importantly with respect to this claim, make 120

monthly rental payments of $592.04 due on the 15th of each month.

Specifically, the Agreement provides in pertinent part:

> LESSOR agrees to lease to LESSEE, the herein described
> property for a term of 120 months for the sum of SEVENTY-
> FOUR THOUSAND EIGHT HUNDRED AND NO/100
> (74,800.00) DOLLARS, with THIRTY THOUSAND ($30,000)
> DOLLARS being paid as an initial payment and the balance og
> FOURTY-FOUR THOUSAND EIGHT  HUNDRED AND
> NO/100 ($44,800.00) DOLLARS, being financed for 120
> months…payable at the monthly rate of FIVE HUNDRED
> NINETY-TWO AND 04/100 ($592.04) DOLLARS, payable on
> the 15th day of each month beginning October 15, 2007…Upon
> the satisfaction and termination of the lease terms contracted
> herein, other than by default, a sale is to be executed by the said
> Sellers in favor of the said Buyers.

> Should Ms. Pierre fail to make such payments, the Agreement further

provided:

> Appearers further declare that the time of payment of each lease
> payment, is of the essence of this Agreement and that if any of
> the said payments are not paid when due or if Lessee shall in
> any other manner violate the covenants hereunder, then in any
> of such events, Lessee shall be in default and Lessor shall have
> the right, at Lessor's option:

> a.) To seek specific performance of this Agreement, and to
>    accelerate all installments due for the unexpired remaining term
>    of this Agreement and declare said amount immediately due
>    payable…

---

[6] The Gardners' obligation to discharge the mortgage is discussed at length in the
earlier section of this opinion entitled Anticipatory Breach.

or

b.) To take immediate eviction action and regain possession of the subject property.

The Agreement in this case provides that in the event that Ms. Pierre should fail to make timely payments of $592.04, she would be placed in default. As a consequence of that default, the Gardners reserved the right to exercise to one of two options: to either seek specific performance and seek all past due rental obligations and future rent, or to evict Ms. Pierre from the Property. Although Ms. Pierre argues that the punctuality of the payments was altered under the decision rendered in *Himbola*, we find that the decision of that case does not subsequently erase Ms. Pierre's contracted obligation to make rental payments; rather, it only amends whether the late payments may be *accepted*. As previously noted, the Gardners and Ms. Pierre orally modified the Agreement, such that the Gardners agreed to accept late payments, but such payments would be subject to a late fee. Furthermore, the Agreement, whether contractually or verbally, did not require the Gardners to specifically afford Ms. Pierre a period in which no payments could be rendered at all.

We further acknowledge that although Ms. Pierre presented a MoneyGram[7] as evidence of her August 15th payment, we assert, arguendo, that even if the MoneyGram served as full payment for the August 15th rental obligation, it is uncontested by both parties that Ms. Pierre failed to make any payment at all for the month of October and only a partial payment of $400.00 for the November 15th rental payment. Subsequently,

---

[7] The Record indicates that amount on the Appellant's MoneyGram, introduced at trial as Plaintiff's exhibit 4, is in dispute as to whether the amount is $592.04 or $529.04.

when Ms. Pierre failed to make two consecutive rental payments, the Gardners, as afforded to them in the Agreement, chose to exercise their right to evict Ms. Pierre. Therefore, given that the terms of the contract govern the parties, we find that the trial court correctly determined that the Gardners acted within the scope of the Agreement and the eviction is proper.

*Damages*

Finally, Ms. Pierre argues that because the Gardners breached the contract, she is entitled to damages. Particularly, Ms. Pierre asserts that when a party breaches a contract, compensatory damages are utilized in order to place the non-breaching party in the position that she would have been in had there been no breach of contract; such damages, in this case, are evident and clear cut. Ms. Pierre argues that if the Gardners did not breach the Agreement, she would have made an additional 36 monthly rental payments of $592.04 and, at the date of the last payment, been granted clear title to the Property.

Additionally, Ms. Pierre argues that she would have been relieved of other housing obligations from September 2017 until August of 2019, when trial was held. As such, a fair assessment of her housing obligations would have been equivalent to the monthly rental payments as set forth in the Agreement. Thus, Ms. Pierre requests a damage award in the full sum of $67,695.52, with legal interest from the date of demand and all costs of these proceedings. The aforementioned compensatory damage calculations are detailed below:

1.  Value of the Property ($74,800.00)
2.  Thirty-six (36) remaining monthly payments (36 x $592.04 for a total of $21,313.44)

20

3. Twenty-four (24) months of excess housing obligations (24 x $592.04, for a total of $14,208.96)

Likewise, the Gardners filed a Reconventional Demand seeking sums for all past due rental obligations and accelerated rent, and other damages the Property sustained.

In first addressing Ms. Pierre's claim for damages, we find that because her claim for anticipatory breach of contract failed, she is therefore not entitled to relief under this doctrine. Second, with respect to the Gardners' claim for damages, Louisiana law affords two remedies to a lessor if a lessee fails to pay rent as it comes due. The lessor may hold the lessee liable for the rent due for the expired term of the lease and sue to dissolve the lease and evict the lessee. In the alternative, the lessor may sue to enforce the lease and to recover both accrued rentals and future accelerated rentals if the lease contains an acceleration clause. These remedies are mutually exclusive. *Richard v. Broussard*, 495 So. 2d 1291 (La. 1986); *Huckabay v. Red River Waterway Com'n*, 27,113 (La. App. 2 Cir. 10/12/95), 663 So. 2d 414, *writ denied*, 95-3007 (La. 03/08/96), 669 So. 2d 403; *Shreveport Plaza Associates Ltd. Partnership v. L.R. Resources II*, 557 So. 2d 1067 (La. App. 2 Cir. 1990).

In the present case, the Agreement specified two options for the Gardners to execute in the event that Ms. Pierre should be in default:

a.) To seek specific performance of this Agreement, and to accelerate all installments due for the unexpired remaining term of this Agreement and declare said amount immediately due payable…

or

b.) To take immediate eviction action and regain possession of the subject property.

The Gardners elected to enforce the latter option, as such, they are not entitled to relief pursuant to the Reconventionl Demand.

## CONCLUSION

For the aforementioned reasons, the trial court's judgment is affirmed in favor of the Gardners with respect to the anticipatory breach of contract and wrongful eviction claims. Costs associated with this appeal are assessed to Ms. Pierre.

**AFFIRMED.**