Judgment rendered April 8, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,783-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

| VICTUS 1, INC. D/B/A BENCHMARK BUSINESS BROKERS | Plaintiff-Appellee |
| --- | --- |

versus

| BRADSHAW'S BODY SHOP, INC. A/K/A BRADSHAW'S AUTO BODY | Defendant-Appellant |
| --- | --- |

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Lincoln, Louisiana
Trial Court No. 59,028

Honorable Monique Babin Clement, Judge

* * * * *

| LAW OFFICE OF TRACY HOUCK, LLC<br>By: Tracy W. Houck | Counsel for Appellant |
| --- | --- |
| BERNARD, CASSISA, ELLIOTT<br>& DAVIS, APLC<br>By: Robert W. Maxwell | |
| THOMAS, SOILEAU, JACKSON<br>& COLE, LLP<br>By: Steven E. Soileau | Counsel for Appellee |

* * * * *

Before COX, THOMPSON, and ELLENDER, JJ.

**COX, J.**

This civil matter arises from the Third Judicial District Court, Lincoln Parish, Louisiana. Defendant-Appellant, Bradshaw's Body Shop, Inc., d/b/a Bradshaw's Auto Body, appeals the district court ruling, awarding Plaintiff-Appellee, Victus 1, Inc., d/b/a Benchmark Business Brokers, liquidation damages for breach of contract. For the following reasons, we affirm the trial court's ruling as to the sale of the business alone; reverse the trial court's ruling as it applies to the sale of the real property and its value; remand for a judicial determination as to the value of the business; affirm the trial court's award of attorney fees; and deny additional requests for attorney fees.

## FACTS & PROCEDURAL HISTORY

On August 5, 2016, Bradshaw's Body Shop, Inc., d/b/a Bradshaw's Auto Body ("Bradshaw"), entered into an exclusive listing agreement with Victus 1, Inc., d/b/a Benchmark Business Brokers ("Victus"), granting Victus the exclusive right to sell or contract to sell Bradshaw, an auto collision repair and wrecker business. The agreement was for a 24-month period, and in pertinent part, provided payment of a broker fee, 10% of the purchase price at the time of sale, if the agreement was canceled or if the property was withdrawn from sale during the listing term. The agreement further specified that the commission would be based on the asking price of the property and would be immediately due. The agreement provides as follows:

### SOLE AND EXCLUSIVE RIGHT TO SELL

1. The Seller hereby grants Benchmark Business Brokers (hereinafter "Broker") the exclusive right to sell, lease, exchange, or contract to sell the real property (if any) and/or the

assets, including all fixtures, equipment, goodwill, trademarks, trade names and inventory, of the above described business ("the Business"), and/or the membership interest in the entity owning all of the assets of the Business.

2. The purchase price for the Business shall include all cash or non-cash consideration, received by the Seller including, but not limited to, cash equivalents, notes, liabilities assumed, earn outs, licensing fees, non-compete and consulting agreements. Seller agrees to pay Broker at closing a fee as follows: 10% of the purchase price.

3. Seller agrees that if this listing is cancelled or the property withdrawn from sale during the listing term by Seller, the commission (based on the asking price) shall become immediately due by Seller to Broker. If Seller refuses or is unable to comply with the listing terms for any reason, thereby preventing disposition of the property during the listing term upon the terms set forth above, the commission (based on the asking price) shall become immediately due by the Seller to the Broker.

4. Seller agrees that the commission shall be immediately due and payable if the Seller, directly or indirectly, enters into a Purchase and Sale Agreement (however designated), conveys, options, transfers any interest in the Business or, accepts a deposit or does any other act tantamount to a sale or contract to sell, without the written approval of the Broker, and the cancellation or rescission of any of the foregoing acts shall not act as a release of Seller from such liability. The commission under this Paragraph 4 shall be based on the purchase price agreed upon by Seller and buyer without the Broker's approval.

5. In any case where the deposit and/or down payment have been forfeited, this amount shall be split 50% to Seller and 50% to Broker.

6. The Seller acknowledges that he/she has supplied the listing information above and Seller warrants such information to be true and correct.

7. Seller agrees to pay Broker's full commission at closing; and Seller grants to the Broker a security interest in said proceeds due at the closing. In the event that Seller (and only Seller) terminates this Agreement, Seller agrees to pay the full commission set forth in this Agreement to the Broker in the event the property described herein is, within 2 years after the termination of this Agreement by Seller, sold, traded or otherwise conveyed to anyone referred to Seller by Broker or with whom Seller had negotiations during the term of this

Agreement. Upon expiration of this Agreement the BROKER shall furnish SELLER with a protective list within 72 hours.

IF YOU RELIST WITH ANOTHER BROKER WITHIN THE OVERRIDE PERIOD AND THEN SELL YOUR PROPERTY TO ANYONE WHOSE NAME APPEARS ON THE LIST, YOU COULD BE LIABLE FOR FULL COMMISSION TO BOTH  BROKERS. IF THIS NOTICE IS NOT FULLY UNDERSTOOD, SEEK COMPETENT ADVICE.

8. This Agreement shall commence on the day and year set forth below and continue for a period of twenty-four (24) months.

9. Should any suit be commenced to enforce the Broker's rights herein, the prevailing party agrees the other party shall pay the expenses connected therewith, including attorney's fees incurred.

10. Seller hereby acknowledges that he/she has read this agreement and has received a copy of it.

11. Seller authorizes Broker to advertise and market the Business. Seller will pay Broker a fee of N/Ato extensively promote the Business beyond Broker's normal scope. This fee will be deducted from Broker's commission.

12. Seller understands that there will be a closing. Seller shall furnish and execute all documents necessary to close on the sale of the Business free of all liens and encumbrances. Seller may be required to pay certain closing costs and Seller wishes for Broker to arrange such closing.

13. Seller acknowledges that he understands the benefits of obtaining a business evaluation independent of Broker. Seller agrees to indemnify and hold Broker harmless from claims against Broker regarding any opinion of business value given by Broker.

14. Within thirty (30) days of the execution of this Agreement, Seller shall provide to Broker copies of ALL business related documents including, but not limited to, the following: a) Business' tax returns, income statements and balance sheets for the last 3 completed calendar years and the current calendar year to date; b) Lease and other real property documents; c) Equipment lease documents; d) Itemization of all liens and encumbrances; e) Itemization of inventory and equipment; f) Description of any and all current or pending litigation or material business issues. Such information will not be independently verified by Broker and will be presented to prospective buyers in the course of selling the Business. Seller

agrees to hold harmless and indemnify the Broker for all claims, losses, damages, and expenses, including reasonable attorney fees resulting from a breach of Seller's representation.

15. Seller agrees to immediately refer to Broker all inquiries of any party interested in the Business. All negotiations are to be through Broker.

16. This Agreement is binding upon the heirs, successors, and assigns of the parties.

17. All of the representations and covenants of this Agreement shall survive and be enforceable after the termination of this Agreement.

18. This Agreement constitutes the complete agreement between the parties and supersedes any prior oral or written agreements between the parties relative to the provisions herein. No amendment, material modification or extension of this Agreement shall be valid or binding unless made in writing and signed by both Seller and an Officer of the Broker.

19. Seller warrants there are no other Exclusive Right to Sell Listing Contracts in force at the time this agreement is signed. This is a legal instrument and if not understood, legal counsel should be consulted before signing.

20. This contract shall be governed by the laws of the State of Louisiana.

21. Seller warrants it has the full legal right to sell the Business and any associated real property. If Seller is a partnership, corporation or other entity, the person(s) signing on behalf of such entity hereby represent(s) and warrant(s) that he/she is, or they have the authority to enter into this contract on behalf of said entity.

22. Severability: The invalidity, illegality, or unenforceability of any obligation or provision under this agreement shall not affect or impair the enforceability or legality of any remaining provision or obligation under this agreement.

On February 28, 2017, Tracey Bradshaw Witt ("Witt"), one of the managers of Bradshaw, notified Victus she was terminating the contract by withdrawing the listing, due to an alleged breach of fiduciary duty. Through Bradshaw, Witt alleged Victus failed to communicate a prospective offer for

4

the sale of the property, and failed to sell, trade, or otherwise convey the property to any potential buyer. The written letter provided in pertinent part:

> This letter is to inform you that Bradshaw's Body Shop, INC. will no longer require your services as of the date stated above. We have decided to terminate our business contract due to fiduciary obligations being abandoned by you as our broker. We were contacted by a potential buyer after contacting you about our property. They were told we had accepted an offer and were no longer for sale. This is a total falsehood with absolutely no truth to this statement.

On July 6, 2017, Victus filed a petition for breach of contract, seeking a broker fee of $130,000 based on the asking price of the property at the time the agreement was terminated, which was $1,300,000. Victus filed a motion for summary judgment on May 18, 2018, alleging there was no material issue of fact that Bradshaw terminated and withdrew the property for sale within the listing period, which was a clear violation of the terms of the agreement. Bradshaw filed an opposition to the motion on October 19, 2018, arguing again that Victus, through its owner, Marc Able ("Able"), breached fiduciary duties by knowingly making false representations and failing to disclose information about a potential buyer. Bradshaw further argued that the listing agreement was contrary to law because Victus was not a licensed broker, and Able did not have a valid real estate license.

On November 5, 2018, the trial court denied the motion for summary judgment, finding that there were genuine issues of material fact regarding the duties and obligations of the parties, the agreement was vague as to this issue, and there was a genuine issue of material facts as to Victus' capacity to enter into this agreement. Thereafter, on August 19, 2020, Bradshaw filed a motion for summary judgment seeking to have Victus' petition for breach of contract dismissed, reasserting that Able was not a licensed real estate

agent, Victus was not a licensed brokerage company, and there was breach of fiduciary duties for failure to disclose information related to the sale of the property. On October 19, 2020, Bradshaw filed a reconventional demand, claiming Victus acted in bad faith because Able did not have a valid real estate license.

A bench trial commenced on February 25, 2025, wherein the following pertinent testimony was presented:

First, Witt testified she and her siblings became managers of Bradshaw when their father retired, and she became the power of attorney for her father. Witt explained that she and her siblings met with Able to sell both the business and the land itself. Witt acknowledged that the listing agreement provided the property was to be listed for a 24-month period beginning August 5, 2016. She also acknowledged that if the property was withdrawn or the agreement cancelled during the listing term, then commission would be immediately due.

Witt stated Able only brought one potential buyer to her attention and failed to communicate any other information about any other potential buyers. Witt stated that she sent a notice to Able cancelling the agreement on February 28, 2017, which was within the listing period, and admitted nothing in the agreement specified Able was required to provide all communications with a member of Bradshaw about the sale of the property. On cross-examination, Witt testified that when she entered the agreement she was under the impression Able was a licensed real estate agent and would not have otherwise entered into the agreement if he was not.

Next, Able testified he was the sole owner of Victus. He stated that when he initially met with Witt and her siblings, they only wanted to sell the

6

business but later included the sale of the property itself to increase their profit. He explained that the original asking price was $1,754,000, but it was later amended to $1,300,000. In selling the business, Able testified that he listed the property online and made numerous calls to individuals he knew who bought and sold businesses. Able stated that after he received potential offers, he would conduct prequalifications, which included getting proof of funding, to ensure the prospective buyer had the secure funding to purchase the property. Able stated he would only provide relevant information to the seller, which is why he did not tell Witt about a potential offer from Kelly Larremore ("Larremore").

Able stated that he knew of Larremore and knew Larremore did not have any assets by which to secure the property and did not want to waste either Witt's or her siblings' time. When asked about his real estate license, Able stated he was issued his license on January 1, 2016, before the listing agreement was executed. He stated that after the listing was cancelled, he received information from the Louisiana Real Estate Commission that the license was issued in error and he would need to take an examination and redo the licensing process, which he did. Regardless, Able stated he also had a broker's license and had not received any sanction, suspension, or revocation of his license. On cross-examination, Able acknowledged that Victus is not a licensed brokerage company, and he was not a licensed real estate broker either.

Able stated he was unaware he would have to take an exam to obtain his real estate license; however, he later stated he registered three different times to take the exam prior to 2016. Able testified that he took several tests before his license was issued but did not sit for the final exam because his

7

license was issued. He stated he was unaware of any issues with his license until November 2017. On redirect, Able testified that he was not aware of any issue with his license while the agreement was still in effect.

At the close of testimony, both parties submitted post-trial briefs for the trial court's consideration. Thereafter, on May 16, 2025, the trial court issued its written ruling on the matter, finding that the listing agreement was valid as to the issue of Able's licensing because Able was unaware that an issue existed with his license until after the agreement was terminated, and therefore, he could not have misled Bradshaw. Further, the trial court found that Able completed the post licensing course, and he had an active estate license at the time the agreement was entered into. Moreover, the trial court determined that Victus was entitled to at least a 10% commission on the estimated value of the business, and awarded Victus $130,000, with an additional $32,865.34 in attorney fees, related expenses, and court costs.

This appeal followed.

## LAW & DISCUSSION

On appeal, Bradshaw presents four assignments of error for appellate review. We will address Bradshaw's third assignment of error first as its resolution is the primary issue before this court, and determines the outcome of the remaining assignments of error.

**Assignment of Error 3: Whether the trial court erred in awarding commission on the asking price of the listing rather than restricting recovery to the business-only value.**

By this third assignment of error, Bradshaw presents a two-fold argument before this Court:

First, Bradshaw contends arguendo, that even if the contract is to be considered valid and enforceable, the trial court erred in finding that Victus

8

was entitled to "at least" a business-only commission and awarding the value of the commission based on the value of the real-estate inclusive price of the business **and** the immovable property itself. Second, Bradshaw likewise argues that even assuming the contract is valid and enforceable, Able's misconduct (i.e., failing to keep Bradshaw abreast of potential buyers and misinforming potential buyers as to the sale of the property) violated his fiduciary duty to uphold honesty, accuracy, and loyalty. As such, Bradshaw argues that termination of the contract, on these grounds, does not trigger an award for damages due to breach.

Contracts have the effect of law for the parties, and the interpretation of a contract is the determination of the common intent of the parties. La. C.C. arts. 1983, 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046; *Prejean v. Guillory*, 10-0740 (La. 7/2/10), 38 So. 3d 274.

In the case sub judice, Bradshaw and Victus initially entered into a written agreement to sell Bradshaw as an incorporeal business. The parties later agreed to sell the immovable property as well, and Able listed the business and property as a whole in the online listing. Due to grievances and what was alleged to be a breakdown in communication between the seller and Bradshaw's representatives, Bradshaw elected to terminate the contract prior to its agreed upon expiration date. The terms of the contract in this case are clear and unambiguous, and Paragraph 3 specifically provides:

> Seller agrees that if this listing is cancelled or the property withdrawn from sale during the listing term by Seller, the commission (based on the asking price) shall become immediately due by Seller to Broker. If Seller refuses or is unable to comply with the listing terms for any reason, thereby

> preventing disposition of the property during the listing term upon the terms set forth above, the commission (based on the asking price) shall become immediately due by the Seller to the Broker.

While this Court finds that this provision, and the contract as a whole, is unduly onerous, it is what the parties contractually agreed to be bound by and the terms of which must be upheld and enforced regardless.

For example, this Court in *Victus 1, Inc. v. Stocky's World Famous Pizza #14, Inc.*, 52,221 (La. App. 2 Cir. 9/26/18), 256 So. 3d 1146, previously upheld the enforceability of a similar contract between Victus and a different obligor, namely Smitty's Pizza. Smitty's Pizza similarly withdrew its business from the agreement and terminated the contract before the term of the agreement expired. *Id*. This Court determined that the contract was valid and enforceable, noting that while written contracts may be modified by oral contracts or by the conduct of the parties, the provisions of the contract indicated that no modification of the agreement was binding on either party unless it was in writing and signed by both parties. *Id*. This Court upheld the provisions of that contract, which is the same contract as in the present case, finding that the words of the agreement in this case were clear and explicit. *Id*. We agree as to the terms of the contract in the present case as well.

We acknowledge that *Victus 1, Inc. v. Stocky's World Famous Pizza #14, Inc.*, *supra*, concerned the sale of just the incorporeal business and is therefore distinguishable from the present matter as it concerns the sale of both incorporeal property and immovable property as well. Generally, our courts have consistently and unequivocally held that an agreement pertaining to immovable property must be in writing. *Lucky v. Carr*, 52,434 (La. App.

10

2 Cir. 1/16/19), 264 So. 3d 693, *writ denied,* 19-0261 (La. 4/8/19), 267 So. 3d 616. Where a contract of mandate to purchase or sell immovable property is not in writing, it is invalid. *Id*. Moreover, Paragraph 18 of the contract provides:

> 18. This Agreement constitutes the complete agreement between the parties and supersedes any prior oral or written agreements between the parties relative to the provisions herein. **No amendment, material modification or extension of this Agreement shall be valid or binding unless made in writing and signed by both Seller and an Officer of the Broker.** (Emphasis added).

In this case, it is undisputed that the parties originally contracted to sell the business itself without the immovable property. The property itself was only later agreed to be encompassed in the sale; however, the contract was never amended to reflect this change or signed by either party to acknowledge the amendment.

In accordance with both general provisions concerning the sale of immovable property and Victus's own provision, we find that the agreement is, therefore, not enforceable only as it pertains to the sale of the real property itself because the contract was not executed in accordance with the laws concerning the sale of the immovable property or the terms of the contract itself. Accordingly, we find that the trial court was correct in finding that Victus was owed its 10% commission in damages related to breach of the contract but only as it concerned the sale of the business and not the listing price for the business and immovable property.

There does not appear to be a separate value for just the business. Therefore, we remand this issue to the trial court for a judicial calculation for the price of the business alone and the commission owed to Victus as a result.

11

**Assignment of Error 1: Whether a party can be awarded a fee for the sale of real property when the real estate agent did not possess a valid license & Assignment of Error 2: Whether the real estate agreement was void as a matter of law.**

We consolidate Bradshaw's first two assignments of error as they both relate to the enforceability of the agreement based upon Able's capacity to enter into the contract due to the error in issuance of his real estate license at the time the contract was entered into. However, due to the resolution of the previous assignment of error, we pretermit consideration and discussion of these two assignments of error.

**Assignment of Error 4: Whether the trial court erred in awarding attorney fees and expenses.**

By its final assignment of error, Bradshaw argues that because the trial court should not have awarded Victus commission for the termination of the listing agreement, Victus was not entitled to attorney fees.

In response, Victus argues that it was the prevailing party in this case and was awarded accordingly. Moreover, Victus argues that this appeal was frivolous and requests attorney fees in accordance with the contract as well as any additional fees and costs incurred.

Paragraph 9 of the contract, as it concerns attorney fees, provides:

Should any suit be commenced to enforce the Brokers' rights herein, the prevailing party agrees the other party shall pay the expenses connected therewith, including attorney's fees incurred.

However, La. C.C.P. art. 2164 provides:

The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal. The court may award damages, including attorney fees, for frivolous appeal or application for writs, and may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered equitable.

This provision is penal in nature and is to be strictly construed. *Cox v. O'Brien*, 49,278 (La. App. 2 Cir. 8/13/14), 147 So. 3d 809, *writ denied*, 14-1907 (La. 11/21/14), 160 So. 3d 972.

Appeals are always favored and, unless the appeal is unquestionably frivolous, damages will not be allowed. *Id.* Damages for frivolous appeal are only allowed when it is obvious that the appeal was taken solely for delay, that the appeal fails to raise a serious legal question or that counsel is not sincere in the view of the law he advocates, even though the court is of the opinion that such view is not meritorious. *Id.* The award of damages and attorney fees for a frivolous appeal are utilized to curtail the filing of appeals that are intended to delay litigation, harass another party, or have no reasonable basis in fact or law. *Nesbitt v. Nesbitt*, 46,514 (La. App. 2 Cir. 9/21/11), 79 So. 3d 347, *writ denied*, 11-2301 (La. 12/2/11), 76 So. 3d 1178.

After consideration of the provisions of the agreement in light of the record before the Court, we do not believe the trial court erred in its award of attorney fees. However, we do not consider Bradshaw's appeal to be frivolous; the appeal does not appear to be done for the purpose of delaying litigation or harassing another party. Further, the appeal has a reasonable basis in both fact and law. Therefore, we decline Victus' request for additional attorney fees and find that both parties should bear their own costs associated with this appeal.

## CONCLUSION

For the foregoing reasons, we AFFIRM the trial court's ruling as to the sale of the business alone; REVERSE the agreement as it applies to the real estate and its value; REMAND for a determination of the value of the business; AFFIRM the trial court's original award for attorney fees, but

13

DENY any additional requests for attorney fees associated with this appeal and order each party to bear their own costs associated with this appeal.

**AFFIRM IN PART; REVERSE IN PART; REMAND FOR FURTHER PROCEEDINGS.**